## PACKARD MOTOR CAR CO. *v.* NATIONAL LABOR RELATIONS BOARD.

No. 658.   Argued January 9, 1947.—Decided March 10, 1947.

*Louis F. Dahling* argued the cause and filed a brief for petitioner.

*Gerhard P. Van Arkel* argued the cause for respondent. With him on the brief were *Acting Solicitor General Washington, Morris P. Glushien, A. Norman Somers, Ruth Weyand* and *Mozart G. Ratner.*

Briefs were filed as *amici curiae* by *Nathan L. Miller, Roger M. Blough, Borden Burr* and *Paul R. Conaghan* for the Carnegie-Illinois Steel Corp. et al.; *Harry P. Jeffrey* for the Foremen's League for Education and Association et al.; and *Nicholas Kelley* for the Chrysler Corporation, urging reversal.

*Walter M. Nelson* filed a brief for the Foreman's Association of America, urging affirmance.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The question presented by this case is whether foremen are entitled as a class to the rights of self-organization, collective bargaining, and other concerted activities as assured to employees generally by the National Labor Relations Act. The case grows out of conditions in the automotive industry, and so far as they are important to the legal issues here the facts are simple.

The Packard Motor Car Company employs about 32,000 rank-and-file workmen. Since 1937 they have been represented by the United Automobile Workers of America affiliated with the Congress of Industrial Organizations. These employees are supervised by approximately 1,100 employees of foreman rank, consisting of about 125 "general foremen," 643 "foremen," 273 "assistant foremen," and 65 "special assignment men." Each general foreman is in charge of one or more departments, and under him in authority are foremen and their assistant foremen. Special assignment men are described as "troubleshooters."

The function of these foremen in general is typical of the duties of foremen in mass-production industry generally. Foremen carry the responsibility for maintaining quantity and quality of production, subject, of course, to the overall control and supervision of the management. Hiring is done by the labor relations department, as is the discharging and laying off of employees. But the foremen are provided with forms and with detailed lists of penalties to be applied in cases of violations of discipline, and initiate recommendations for promotion, demotion and discipline. All such recommendations are subject to the reviewing procedure concerning grievances provided in the collectively-bargained agreement between the Company and the rank-and-file union.

The foremen as a group are highly paid and, unlike the workmen, are paid for justifiable absence and for holidays, are not docked in pay when tardy, receive longer paid vacations, and are given severance pay upon release by the Company.

These foremen determined to organize as a unit of the Foremen's Association of America, an unaffiliated organization which represents supervisory employees exclusively. Following the usual procedure, after the Board had decided that "all general foremen, foremen, assistant fore-

men, and special assignment men employed by the Company at its plants in Detroit, Michigan, constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9 (b) of the Act," [1] the Foremen's Association was certified as the bargaining representative. The Company asserted that foremen were not "employees" entitled to the advantages of the Labor Act, and refused to bargain with the union. After hearing on charge of unfair labor practice, the Board issued the usual cease-and-desist order. The Company resisted and challenged validity of the order. The judgment of the court below decreed its enforcement, 157 F. 2d 80, and we granted certiorari. 329 U. S. 707.

The issue of law as to the power of the National Labor Relations Board under the National Labor Relations Act is simple and our only function is to determine whether the order of the Board is authorized by the statute.

The privileges and benefits of the Act are conferred upon employees, and § 2 (3) of the Act, so far as relevant, provides "The term 'employee' shall include any employee . . . ." 49 Stat. 450. The point that these foremen are employees both in the most technical sense at common law as well as in common acceptance of the term, is too obvious to be labored. The Company, however, turns to the Act's definition of employer, which it contends reads foremen out of the employee class and into the class of employers. Section 2 (2) reads: "The term 'employer' includes any person acting in the interest of an employer, directly or indirectly . . . ." 49 Stat. 450. The context of the Act, we think, leaves no room for a construction of this section to deny the organizational privilege to employees because they act in the interest of an employer. Every employee, from the very fact of employment in the master's business, is required to act in his interest. He

---

[1] 61 N. L. R. B. 4, 26.

owes to the employer faithful performance of service in his interest, the protection of the employer's property in his custody or control, and all employees may, as to third parties, act in the interests of the employer to such an extent that he is liable for their wrongful acts. A familiar example would be that of a truck driver for whose negligence the Company might have to answer.

The purpose of § 2 (2) seems obviously to render employers responsible in labor practices for acts of any persons performed in their interests. It is an adaptation of the ancient maxim of the common law, *respondeat superior,* by which a principal is made liable for the tortious acts of his agent and the master for the wrongful acts of his servants. Even without special statutory provision, the rule would apply to many relations. But Congress was creating a new class of wrongful acts to be known as unfair labor practices, and it could not be certain that the courts would apply the tort rule of *respondeat superior* to those derelictions. Even if it did, the problem of proof as applied to this kind of wrongs might easily be complicated by questions as to the scope of the actor's authority and of variance between his apparent and his real authority. Hence, it was provided that in administering this act the employer, for its purposes, should be not merely the individual or corporation which was the employing entity, but also others, whether employee or not, who are "acting in the interest of an employer."

Even those who act for the employer in some matters, including the service of standing between management and manual labor, still have interests of their own as employees. Though the foreman is the faithful representative of the employer in maintaining a production schedule, his interest properly may be adverse to that of the employer when it comes to fixing his own wages, hours, seniority rights or working conditions. He does not lose his right to serve himself in these respects because he

serves his master in others. And we see no basis in this Act whatever for holding that foremen are forbidden the protection of the Act when they take collective action to protect their collective interests.

The company's argument is really addressed to the undesirability of permitting foremen to organize. It wants selfless representatives of its interest. It fears that if foremen combine to bargain advantages for themselves, they will sometimes be governed by interests of their own or of their fellow foremen, rather than by the company's interest. There is nothing new in this argument. It is rooted in the misconception that because the employer has the right to wholehearted loyalty in the performance of the contract of employment, the employee does not have the right to protect his independent and adverse interest in the terms of the contract itself and the conditions of work. But the effect of the National Labor Relations Act is otherwise, and it is for Congress, not for us, to create exceptions or qualifications at odds with its plain terms.

Moreover, the company concedes that foremen have a right to organize. What it denies is that the statute compels it to recognize the union. In other words, it wants to be free to fight the foremen's union in the way that companies fought other unions before the Labor Act. But there is nothing in the Act which indicates that Congress intended to deny its benefits to foremen as employees, if they choose to believe that their interests as employees would be better served by organization than by individual competition.[2] *N. L. R. B.* v. *Skinner & Kennedy Stationery Co.,* 113 F. 2d 667; see *N. L. R. B.* v. *Armour & Co.,* 154 F. 2d 570, 574.

---

[2] If a union of vice presidents, presidents or others of like relationship to a corporation comes here claiming rights under this Act, it will be time enough then to point out the obvious and relevant differences between the 1,100 foremen of this company and corporate officers elected by the board of directors.

There is no more reason to conclude that the law prohibits foremen as a class from constituting an appropriate bargaining unit than there is for concluding that they are not within the Act at all. Section 9(b) of the Act confers upon the Board a broad discretion to determine appropriate units. It reads, "The Board shall decide in each case whether, in order to insure to employees the full benefit of their right to self-organization and to collective bargaining, and otherwise to effectuate the policies of this Act, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof." 49 Stat. 453. Our power of review also is circumscribed by the provision that findings of the Board as to the facts, if supported by evidence, shall be conclusive. § 10 (e), 49 Stat. 454. So we have power only to determine whether there is substantial evidence to support the Board, or its order oversteps the law. *N. L. R. B.* v. *Link-Belt Co.,* 311 U. S. 584; *Pittsburgh Plate Glass Co.* v. *N. L. R. B.,* 313 U. S. 146.

There is clearly substantial evidence in support of the determination that foremen are an appropriate unit by themselves and there is equal evidence that, while the foremen included in this unit have different degrees of responsibility and work at different levels of authority, they have such a common relationship to the enterprise and to other levels of workmen that inclusion of all such grades of foremen in a single unit is appropriate. Hence the order insofar as it depends on facts is beyond our power of review. The issue as to what unit is appropriate for bargaining is one for which no absolute rule of law is laid down by statute, and none should be by decision. It involves of necessity a large measure of informed discretion, and the decision of the Board, if not final, is rarely to be disturbed. While we do not say that a determination of a unit of representation cannot be so unreasonable and arbitrary as to exceed the Board's power, we are clear that

the decision in question does not do so. That settled, our power is at an end.

We are invited to make a lengthy examination of views expressed in Congress while this and later legislation was pending to show that exclusion of foremen was intended. There is, however, no ambiguity in this Act to be clarified by resort to legislative history, either of the Act itself or of subsequent legislative proposals which failed to become law.

Counsel also would persuade us to make a contrary interpretation by citing a long record of inaction, vacillation and division of the National Labor Relations Board in applying this Act to foremen. If we were obliged to depend upon administrative interpretation for light in finding the meaning of the statute, the inconsistency of the Board's decisions would leave us in the dark.[3] But there are difficult questions of policy involved in these cases which, together with changes in Board membership, account for the contradictory views that characterize their history in the Board. Whatever special questions there are in determining the appropriate bargaining unit for

---

[3] The Board had held that supervisory employees may organize in an independent union, *Union Collieries Coal Co.,* 41 N. L. R. B. 961, 44 N. L. R. B. 165; and in an affiliated union, *Godchaux Sugars, Inc.,* 44 N. L. R. B. 874. Then it held that there was no unit appropriate to the organization of supervisory employees. *Maryland Drydock Co.,* 49 N. L. R. B. 733; *Boeing Aircraft Co.,* 51 N. L. R. B. 67; *Murray Corp. of America,* 51 N. L. R. B. 94; *General Motors Corp.,* 51 N. L. R. B. 457. In this case, 61 N. L. R. B. 4, 64 N. L. R. B. 1212; in *L. A. Young Spring & Wire Corp.,* 65 N. L. R. B. 298; *Jones & Laughlin Steel Corp.,* 66 N. L. R. B. 386, 71 N. L. R. B. 1261; and in *California Packing Corp.,* 66 N. L. R. B. 1461, the Board re-embraced its earlier conclusions with the same progressive boldness it had shown in the *Union Collieries* and *Godchaux Sugars* cases. In none of this series of cases did the Board hold that supervisors were not employees. See *Soss Manufacturing Co.,* 56 N. L. R. B. 348.

foremen are for the Board, and the history of the issue in the Board shows the difficulty of the problem committed to its discretion. We are not at liberty to be governed by those policy considerations in deciding the naked question of law whether the Board is now, in this case, acting within the terms of the statute.

It is also urged upon us most seriously that unionization of foremen is from many points bad industrial policy, that it puts the union foreman in the position of serving two masters, divides his loyalty and makes generally for bad relations between management and labor. However we might appraise the force of these arguments as a policy matter, we are not authorized to base decision of a question of law upon them. They concern the wisdom of the legislation; they cannot alter the meaning of otherwise plain provisions.

The judgment of enforcement is

*Affirmed.*

Mr. Justice Douglas, with whom The Chief Justice and Mr. Justice Burton concur, dissenting.

*First.* Over thirty years ago Mr. Justice Brandeis, while still a private citizen, saw the need for narrowing the gap between management and labor, for allowing labor greater participation in policy decisions, for developing an industrial system in which cooperation rather than coercion was the dominant characteristic.[1] In his view, these were

---

[1] "The greater productivity of labor must not only be attainable, but attainable under conditions consistent with the conservation of health, the enjoyment of work, and the development of the individual. The facts in this regard have not been adequately established. In the task of ascertaining whether proposed conditions of work do conform to these requirements, the laborer should take part. He is indeed a necessary witness. Likewise in the task of

measures of therapeutic value in dealing with problems of industrial unrest or inefficiency.

The present decision may be a step in that direction. It at least tends to obliterate the line between management and labor. It lends the sanctions of federal law to unionization at all levels of the industrial hierarchy. It tends to emphasize that the basic opposing forces in industry are not management and labor but the operating group on the one hand and the stockholder and bondholder group on the other. The industrial problem as so defined comes down to a contest over a fair division of the gross receipts of industry between these two groups. The struggle for control or power between management and labor becomes secondary to a growing unity in their common demands on ownership.

I do not believe this is an exaggerated statement of the basic policy questions which underlie the present decision. For if foremen are "employees" within the meaning of the National Labor Relations Act, so are vice-presidents, managers, assistant managers, superintendents, assistant superintendents—indeed, all who are on the payroll of the company, including the president; all who are commonly referred to as the management, with the exception of the directors. If a union of vice-presidents applied for recognition as a collective bargaining agency, I do not see how we could deny it and yet allow the present application. But once vice-presidents, managers, superintendents, foremen all are unionized, management and labor will become more of a solid phalanx than separate factions in warring camps. Indeed, the thought of some

---

determining whether in the distribution of the gain in productivity justice is being done to the worker, the participation of representatives of labor is indispensable for the inquiry which involves essentially the exercise of judgment." Brandeis, Business—A Profession (1933) pp. 52–53.

labor leaders that if those in the hierarchy above the workers are unionized, they will be more sympathetic with the claims of those below them, is a manifestation of the same idea.[2]

I mention these matters to indicate what tremendously important policy questions are involved in the present decision. My purpose is to suggest that if Congress, when it enacted the National Labor Relations Act, had in mind such a basic change in industrial philosophy, it would have left some clear and unmistakable trace of that purpose. But I find none.

*Second.* "Employee" is defined to include "any" employee. § 2 (3), 49 Stat. 449, 450, 29 U. S. C. § 152. If we stop there, foremen are included as are all employees from the president on down. But we are not warranted in stopping there. The term "employee" must be considered in the context of the Act. *National Labor Relations Board* v. *Hearst Publications,* 322 U. S. 111, 124; *Phelps Dodge Corp.* v. *National Labor Relations Board,* 313 U. S. 177, 191. When it is so considered it does not appear to be used in an all-embracing sense. Rather, it is used in opposition to the term "employer." An "employer" is defined to include "any person acting in the interest of an employer." § 2 (2). The term "employer" thus includes some employees. And I find no evidence that one personnel group may be both employers and employees within the meaning of the Act. Rather, the Act on its face seems to classify the operating group of industry into two classes; what is included in one group is excluded from the other.

It is not an answer to say that the two statutory groups are not exclusive because every "employee" while on duty—whether driving a truck or stoking a furnace or

---

[2] The Foreman Abdicates, XXXII Fortune, No. 3, p. 150, 152; Levenstein, Labor Today and Tomorrow (1946) ch. VII.

operating a lathe—is "acting in the interest" of his employer and is then an "employer" in the statutory sense. The Act was not declaring a policy of vicarious responsibility of industry. It was dealing solely with labor relations. It put in the employer category all those who acted for management not only in formulating but also in executing its labor policies.[3]

Foremost among the latter were foremen. Trade union history shows that foremen were the arms and legs of management in executing labor policies. In industrial conflicts they were allied with management. Management indeed commonly acted through them in the unfair labor practices which the Act condemns.[4] When we upheld the imposition of the sanctions of the Act against management, we frequently relied on the acts of foremen through whom management expressed its hostility to trade unionism.[5]

*Third.* The evil at which the Act was aimed was the failure or refusal of industry to recognize the right of workingmen to bargain collectively. In § 1 of the Act, Congress noted that such an attitude on the part of industry led "to strikes and other forms of industrial strife or unrest" so as to burden or obstruct interstate commerce. We know from the history of that decade that the frustrated efforts of workingmen, of laborers, to organize led to strikes, strife, and unrest. But we are pointed to no instances where foremen were striking; nor

---

[3] Daykin, The Status of Supervisory Employees under the National Labor Relations Act, 29 Iowa L. Rev. 297; Rosenfarb, The National Labor Policy (1940) pp. 54–56, 116–120; Twentieth Century Fund, How Collective Bargaining Works (1942) pp. 512–514, 547, 557–558, 628, 780.

[4] See cases collected in Daykin, *op. cit. supra,* note 3, pp. 298–299.

[5] *International Association of Machinists* v. *National Labor Rel. Bd.,* 311 U. S. 72, 79–80; *Heinz Co.* v. *National Labor Rel. Bd.,* 311 U. S. 514, 520–521.

are we advised that managers, superintendents, or vice-presidents were doing so.[6]

Indeed, the problems of those in the supervisory categories of management did not seem to have been in the consciousness of Congress. Section 1 of the Act refers to "wage rates," "wage earners," "workers." There is no phrase in the entire Act which is descriptive of those doing supervisory work. Section 2 (3) exempts from the term "employee" any "agricultural laborer." But if "employee" includes a foreman, it would be most strange to find Congress exempting "agricultural laborers," but not "agricultural foremen." The inference is strong that since it exempted only agricultural "laborers," it had no idea that agricultural "foremen" were under the Act.

If foremen were to be included as employees under the Act, special problems would be raised—important problems relating to the unit in which the foremen might be represented. Foremen are also under the Act as employers. That dual status creates serious problems. An act of a foreman, if attributed to the management, constitutes an unfair labor practice; the same act may be part of the foreman's activity as an employee. In that event the employer can only interfere at his peril.[7] The com-

---

[6] It is true that for many years some unions included supervisory employees, Beatrice and Sidney Webb, Industrial Democracy (1902) p. 546, fn. 2; Union Membership and Collective Bargaining by Foremen, U. S. Dept. of Labor, B. L. S. Bull. No. 745 (1943); Report of Panel of War Labor Board in Disputes Involving Supervisors (1945) IX; Twentieth Century Fund, *op. cit. supra,* note 3, pp. 67, 216; Northrup, Unionization of Foremen, 21 Harv. Bus. Rev. 496. But organization of foremen on a broad scale is a development of the last few years. Daykin, *op. cit. supra,* note 3, p. 314; Rosenfarb, Foremen on the March, 7 Fed. Bar. J. 168; Note, 59 Harv. L. Rev. 606, 607; Comment, 55 Yale L. J. 754, 756; Foremen's Unions, IX Advanced Management Quarterly J. 110.

[7] Cf. *Jones & Laughlin Steel Corp.* v. *National Labor Rel. Bd.,* 146 F. 2d 833; Comment, 55 Yale L. J. 754, 767–774; Rosenfarb, *op. cit. supra, note* 6.

plications of dealing with the problems of supervisory employees strongly suggest that if Congress had planned to include them in its project, it would have made some special provision for them. But we find no trace of a suggestion that when Congress came to consider the units appropriate for collective bargaining,[8] it was aware that groups of employees might have conflicting loyalties. Yet that would have been one of the most important and conspicuous problems if foremen were to be included. The failure of Congress to formulate a policy respecting the peculiar and special problems of foremen suggests an absence of purpose to bring them under the Act. And the notion is hard to resist that the very absence of a declaration by Congress of its policy respecting foremen is the reason the Board has been so much at large in the treatment of the problem under the Act. See the cases collected in note 3 of the opinion of the Court.

*Fourth.* When we turn from the Act to the legislative history, we find no trace of Congressional concern with the problems of supervisory personnel. The reports and debates are barren of any reference to them, though they are replete with references to the function of the legislation in protecting the interests of "laborers" and "workers." [9]

---

[8] Section 9 (b) of the Act provides: "The Board shall decide in each case whether, in order to insure to employees the full benefit of their right to self-organization and to collective bargaining, and otherwise to effectuate the policies of this Act, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof."

[9] See H. Rep. No. 969, 74th Cong., 1st Sess.; H. Rep. No. 972, 74th Cong., 1st Sess.; H. Rep. No. 1147, 74th Cong., 1st Sess.; S. Rep. No. 573, 74th Cong., 1st Sess., pp. 6–7; Hearings, Senate Comm. on Educ. and Labor on S. 2926, 73d Cong., 2d Sess.; Hearings, House Comm. on Labor on H. R. 6288, 74th Cong., 1st Sess.; Hearings, Senate Comm. on Educ. and Labor on S. 1958, 74th Cong., 1st Sess.; 79 Cong. Rec. 2371, 7565, 7648, 7668, 8537, 9676, 9713, 9736, 10720.

*Fifth.* When we turn to other related legislation, we find that when Congress desired to include managerial officials or supervisory personnel in the category of employees, it did so expressly. The Railway Labor Act of 1926, 44 Stat. 577, 45 U. S. C. § 151, defines "employee" to include "subordinate official." The Merchant Marine Act of 1936, 52 Stat. 953, 46 U. S. C. § 1101 *et seq.,* which deals with maritime labor relations as a supplement to the National Labor Relations Act (see 46 U. S. C. § 1252), defines "employee" to include "subordinate official." 46 U. S. C. § 1253 (c). And the Social Security Act, 49 Stat. 620, 647, 42 U. S. C. § 1301, includes an officer of a corporation in the term employee.[10] The failure of Congress to do the same when it wrote the National Labor Relations Act has some significance, especially where the legislative history is utterly devoid of any indication that Congress was concerned with the collective bargaining problems of supervisory employees.

*Sixth.* The truth of the matter is, I think, that when Congress passed the National Labor Relations Act in 1935, it was legislating *against* the activities of foremen, not on their behalf. Congress was intent on protecting the right of free association—the right to bargain collectively—by the great mass of workers, not by those who were in authority over them and enforcing oppressive industrial policies. Foremen were instrumentalities of those industrial policies. They blocked the wage earners' path to fair collective bargaining. To say twelve years later that foremen were treated as the victims of that anti-labor policy seems to me a distortion of history.

---

[10] Cf. Federal Employers' Liability Act, 35 Stat. 65, as amended, 45 U. S. C. § 51, under which the term "any employee of a carrier" has been applied to foremen. *Owens* v. *Union Pac. R. Co.,* 319 U. S. 715; *Ellis* v. *Union Pac. R. Co.,* 329 U. S. 649.

If we were to decide this case on the basis of policy, much could be said to support the majority view.[11] But I am convinced that Congress never faced those policy issues when it enacted this legislation. I am sure that those problems were not in the consciousness of Congress. A decision on these policy matters cuts deep into our industrial life. It has profound implications throughout our economy. It involves a fundamental change in much of the thinking of the nation on our industrial problems. The question is so important that I cannot believe Congress legislated unwittingly on it. Since what Congress wrote is consistent with a restriction of the Act to workingmen and laborers, I would leave its extension over supervisory employees to Congress.

I have used the terms foremen and supervisory employees synonymously. But it is not the label which is important; it is whether the employees in question represent or act for management on labor policy matters. Thus one might be a supervisory employee without representing management in those respects. And those who are called foremen may perform duties not substantially different from those of skilled laborers.

What I have said does not mean that foremen have no right to organize for collective bargaining. The general law recognizes their right to do so. See *American Steel Foundries* v. *Tri-City Council*, 257 U. S. 184, 209; *Texas & N. O. R. Co.* v. *Railway Clerks,* 281 U. S. 548, 570. And

---

[11] Daykin, *op. cit. supra,* note 3, p. 313; Rosenfarb, *op. cit. supra,* note 6; Gartenhaus, The Foreman Goes Union, 113 New Republic 563; Comment, 55 Yale L. J. 754; Hearings, House Comm. on Military Affairs on Bills relating to the Full Utilization of Manpower, 78th Cong., 1st Sess., p. 299; Northrup, The Foreman's Association of America, 23 Harv. Bus. Rev. 187; cf. American Management Association, Relations Between Management and Foremen in American Industry (1944); *Id.* The Foreman in Labor Relations (1944); *Id.* Should Management be Unionized? (1945).

some States have placed administrative machinery and sanctions behind that right.[12]   But as I read the Federal Act, Congress has not yet done so.

MR. JUSTICE FRANKFURTER agrees with this opinion except the part marked *"First"* as to which he expresses no view.

---

[12] The state laws are discussed in Northrup, The Foreman's Association of America, 23 Harv. Bus. Rev. 187, 199–200.