291 F.2d 381
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
DES MOINES ELECTROTYPERS' UNION No. 84 and the International
Stereotypers' and Electrotypers' Union of North
America, AFL-CIO, Respondents.
 No. 16652.
 United States Court of Appeals Eighth Circuit.
 June 6, 1961.
 
 Standau E. Weinbrecht, Atty., N.L.R.B., Washington, D.C., for petitioner; Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin J. Welles, Atty., N.L.R.B., Washington, D.C., on the brief.
 Lex Hawkins, Des Moines, Iowa, for respondents.
 Before JOHNSEN, Chief Judge, and WOODROUGH and MATTHES, Circuit judges.
 WOODROUGH, Circuit Judge.
 
 
 1
 This case is before the Court upon the petition of the National Labor Relations Board, pursuant to Section 10(e) of the Act, as amended (61 Stat. 136, 73 Stat. 519, 29 U.S.C.A. 151 et seq.), for the enforcement of its order issued on August 24, 1960, against the Des Moines Electrotypers' Union No. 84 and the International Stereotypers' and Electrotypers' Union of North America, AFL-CIO (herein called Electrotypers). The Board's decision and order are reported at 128 N.L.R.B. No. 97. This Curt has jurisdiction over the proceding, the unfair labor practice having occurred in Des Moines, iowa, within the judicial circuit. No issue as to the Board's jurisdiction is presented. The charging party, the Meredith Publishing Company, is a publisher and distributor of books and magazines, including Better Homes and Gardens, whose annual sales outside the State of Iowa exceed $50,000,000.
 
 
 2
 The Board's finding, the nature of the work in dispute, the dispute, the Board's conclusions and the order sought to be enforced are epitomized as follows:
 
 
 3
 The Board found that the Electrotypers, aided by the International, hd engaged in a strike at the Meredith Publishing Company (herein called Meredith) for the purpose of forcing Meredith to assign work on Pin System Machines Nos. 1 and 2 to employees represented by it, rather than to employees represented by the Des Moines Printing Pressmen and Assistant's Union No. 86 and the International Printing Pressmen and Assistants' Union of North America, AFL-CIO (herin called Pressmen). Upon consideration of the units previously certified for the respective unions, and their contracts with Meredith, the Board determined that the employees performing the disputed work were properly included within the bargaining unit represented by the Pressmen and not within the bargaining unit represnted by the Electrotypers. It therefore concluded that the Electrotypers had violated Section 8(b)(4)(D) by strking for a proscribed purpose.
 
 
 4
 The production of each of the many multicolored impressions contained in the periodicals published by Meredith requires a series of printing plates, one for each color, bearing only that portion of the total impression to be printed in that color. The correlative positioning or adjustment of such a series of plates on the printing press so that in operation the colored image produced by each plate will appear in its proper position on the printed surface without overlapping the images produced by other plates in the series, is known in the trade as registration of the colored plates. Steps taken before the plates are placed on the press to mark them in such a manner that they may be placed on the press in substantial register, usually in relation to position markings on the press cylinder, and thereby reducing the trial and error adjustments of the registration process, are known as preregistration of color plates.
 
 
 5
 Prior to the introduction of the six machines of the 'pin system' which gave rise ot the work assignment dispute in this case, the finishing, preregistration and registration of color plates at Meredith was accomplished in the following manner. After completion of the molding process, performed by members of the Electrotypers, the printing plates were transferred to the Finishing Department, also staffed by members of the Electrotypers, where the plate was squared in the process of trimming off the excess metal. The plates were cleaned, placed on a boring machine which shaved them to the prescribed thickness, and then placed on a proofing press-- operated by a member of the Pressmenwhere a working proof was pulled to reveal imperfections. The Electrotypers then corrected the imperfections, properly curved the plate if necessary, and trimmed, beveled and cropped the plate as required to fit the press. In trimming the plate the Electrotypist determined its location on the press from a 'plan of running' and by using a plastic guide on the duplex beveling machine determined where the trimming cuts should be made to leave the amount of dead metal required on the plate for proper positioning on the press. In addition to exercising judgment as to how much dead metal to leave on the plate, the trimming process required the Electrotypist to perform a number of manual operations which included positioning and clamping the plates on the machines for each of the several cuts in the side and end trimming, beveling, squaring and scarfing of the plates. After trimming, the plates were chrome-plated by the Molding Department, another inspection proof was drawn by the Pressmen, and any final revision necessary was performed by the Electrotypers.
 
 
 6
 The finished plates were then turned over to the pressmen in the Inspection Department who preregistered them by placing scribe marks on each side, the top and bottom of each plate which enabled the plates to be lined up on the press with similar positioning marks on the press cylinder. The location of the scribe marks on the plates was determined by placing a template bearing positioning marks over the plates in a position determined by reference to a paste-up dummy or proof of the page as it should appear. The plates of each color series were individually scribed by this method and then placed upon the press in the position determined by the scribe marks. Proofs were pulled after which final adjustments of the plates were made as necessary to bring them into accurate register.
 
 
 7
 In September 1958 Meredith initiated use of the six machines in the 'pin system' for the preregistration and trimming of the color plates. Under this system a transparent plastic proof of the black or predominant color plate is drawn after the first proofing and correcting operation. This proof is placed upon Machine No. 1 of the pin system, which is basically an illuminated drafting surface, and overlaid with a transparent plastic template bearing positioning lines showing the desired position of the printed matter upon the finished page of the magazine. By reference to a paste-up dummy or proof of the page as it should appear, a folio marking operation is performed in which the template is used to mark the transparent proof to show the position it bears upon the finished page of the printed material. Thus marked, the transparent proof is placed on an illuminated saddle, or drum, on the right-hand side of Machine No. 2, where it is fastened in a position determined by the correspondence of the marks made on the plastic proof with permanent markings on the saddle. The printed plate from which the transparent proof was taken is then mounted upon a saddle on the left-hand side of the machine and rotated and moved in such fashion that its image, projected upon a ground glass screen on the machine through a system of optics, is directly superimposed upon the image of the plastic proof similarly projected upon that screen. The plate is then fastened to the saddle on which it rests in the precise position where the images are in superimposition and two pilot holes of small diameter are drilled in the dead metal of the plate by drills mounted in a stationary position on the machine. All other plates of that color series to be registered together are then marked in similar fashion without altering the position of the transparent proof.
 
 
 8
 The plates are then placed on Machine No. 3, essentially a punch press, which uses the pilot holes located and drilled by Machine No. 2 as reference marks for the punching of pin holes through the dead metal of the plates. Those pin holes, from which the pin system derives its name, determine the position of the plates in the subsequent operations on Machines Nos. 4, 5, and 6, where the plate fits over pins mounted on the machines. Being thus automatically positioned when clamped on those machines, they are automatically trimmed, beveled, squared and scarfed. The pin holes also determine the position of the plate during the lamination process and during the automatic scribing operation performed by Machine No. 6, which places scribe marks on the plate to be used by the pressmen in positioning the plate on the press cylinder in the same manner they used the scribe marks formerly placed by hand in the Inspection Department. The pin holes are removed in the final trimming or cropping operation and all plates are turned out a uniform size without any dead metal. The subsequent inspection operations and the positioning and registration of the plates on the press are performed in the same manner as formerly.
 
 
 9
 At the time of the initiation of the pin system by Meredith, both the Electrotypers and the Pressmen held certifications from the Board as representatives of appropriate units of Meredith employees. Each had entered into a collective bargaining contract with Meredith which was in effect at that time. The unit for which the Electrotypers was certified included 'All employees of the Electrotyping Department of Meredith Publishing Co. at its operation in Des Moines, Iowa, including molders and finishers.' The jurisdiction clause of its contract with Meredith included, in pertinent part, 'All employees * * * performing the following operations * * * Squaring of plates; * * * Beveling of plates; * * * Squaring curved cast plates; * * * Laminating plates; Scarfing laminated plates; * * * Curved finishing of plates; * * * Cropping plates to size; * * *.' That contract expired on February 28, 1959, and had not been renewed at the time of the strike.
 
 
 10
 The unit for which the Pressmen had been certified included, in pertinent part, '* * * Members of the Inspection and Preliminary Make-Ready Department employed by the Company' and the jurisdiction clause of its contract with Meredith included '* * * all types of printing devices and all devices associated therewith.' The contract, which expired on December 31, 1958, contained special provisions applying to the Inspection and Make-Ready Department. A contract effective January 1, 1959, provided that the jurisdiction of the Pressmen should include '* * * pre-mark ready processes' and contained the same provisions relating to the Inspection and Make-Ready Department.
 
 
 11
 The pin system in use at Meredith was developed by its Mechanical Research and Materials Testing Department and first placed in operation on September 9, 1958. Both Pressmen and the Electrotypers claimed that the operations performed on Machines Nos. 1 and 2 were properly within their certification and contracts although it was agreed by all that Machines Nos. 3 through 6, which fabricated the plates, were properly within the jurisdiction of the Electrotypers. Until the dispute concerning the assignment of Machines Nos. 1 and 2 was settled it was agreed by both unions that the machines could be operated by members of Meredith's mechanical research department who were still doing so at the time of the hearing in this case. By a letter of October 30, 1958, Meredith informed the Electrotypers that it had decided to assign members of the Pressmen to operate Machines Nos. 1 and 2 because (1) it considered them to the preregistration devices and therefore only a new method of doing the same work the Pressmen had traditionally performed, and (2) since those machines controlled the quality of the registration of the color plates, which would of course still be performed by the Pressmen, they should be operated by the Pressmen to avoid division of responsibility for quality control. On December 16, 1958, the Pressmen wrote Meredith asserting their claim to the operation of the machines because they did work the Pressmen had always performed.
 
 
 12
 The Electrotypers continued to assert a claim to the operation of the machines which subsequent conferences failed to resolve. At one such conference held April 6, 1959, at which both unions and Meredith were represented, tentative agreement was reached that the unions would abide by the assignment of the Company. Company representatives immediately prepared a written memorandum of that agreement setting forth the Company's assignment of Machines Nos. 1 and 2 to the Pressmen but the agreement was never signed or put into effect. At a similar conference held July 13, 1959, which likewise produced no agreement, International Electrotypers' Union representative informed Meredith industrial relations director that if the work was given to the Pressmen, the Electrotypers would stop work and walk the streets.
 
 
 13
 Four days later the Electrotypers went on strike, beginning at noon on July 17, 1959, when picketing began at the employee and truck and railway entrances to Meredith's plant. None of the Electrotypers employed by Meredith reported for work as a result of the picketing. On July 18, Meredith obtained an order from the United States District Court enjoining the picketing which was discontinued about noon on July 20, when the order was served, and the Electrotypers returned to work.
 
 
 14
 The unfair labor practice charges, first filed on July 17 before the strike began, and later amended to set forth the occurrence of the strike, alleged that the Electrotypers had violated Section 8(b)(4)(D), the 'jurisdictional disputes' section of the statute. Pursuant to the provisions of the Act, the Board held a hearing to hear and determine the dispute out of which the unfair labor practice charges arose.
 
 
 15
 The Board found, that the employees of Meredith operating Machines Nos. 1 and 2 in the pin system are appropriately included in the bargaining unit presently represented by the Pressmen and not in the bargaining unit represented by the Electrotypers. The Electrotypers refused to comply with the Board's determination and on February 19, 1960, the General Counsel of the Board issued a complaint alleging that the strike against Meredith violated Section 8(b)(4) (D) of the Act.
 
 
 16
 At the hearing upon the complaint, the Board admitted the official records of the prior Section 10(k) proceedings, and upon all the evidence concluded that the Electrotypers had violated Section 8(b)(4)(D) 'by engaging in a strike and picketing with an object of forcing or requiring Meredith to assign the disputed work on Machines No. 1 and No. 2 of Pin System to its members * * *.'
 
 
 17
 The Board entered an order which requires the Electrotypers to cease and desist from engaging in, or inducing and encouraging the employees of Meredith to engage in strike, or other proscribed conduct, where an object thereof is to force or require Meredith to assign work on Pin System Machines Nos. 1 and 2 to members of the Electrotypers rather than to other employees, except insofar as such action is permitted under Section 8(b)(4)(D). Affirmatively, the order directs the Electrotypers to post appropriate notices of compliance.
 
 
 18
 It is insisted for the Board in support of its petition for enforcement that its determination that employees of Meredith operating Pin System Machines Nos. 1 and 2 were properly included within the bargaining unit represented by the Pressmen, and not in the bargaining unit represented by the Electrotypers, is neither arbitrary nor capricious, citing Packard Motor Car. Co. v. N.L.R.B., 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040; Harris Langenberg Hat Company v. N.L.R.B., 8 Cir., 216 F.2d 146; Local 26, International Fur and Leather Workers Union, 90 N.L.R.B. 1379; Amalgamated Meat Cutters and Butcher Workmen, Local 556, 101 N.L.R.B. 181; Window Glass Cutters League of America, AFL-CIO, 123 N.L.R.B. 1183.
 
 
 19
 Section 8(b)(4)(D) of the National Labor Relations Act makes it an unfair labor practice for a labor organization to strike for the purpose of forcing or requiring an employer to assign particular work to employees in one labor organization, rather than to those in another, unless in his assignment the employer is failing to conform to a valid contract, or an order or certification of the Board determining the bargaining representative for employees performing such work. In the instant case, it is conceded that an object of the strike by the Electrotypers was to force Meredith to assign the word to them, and it is also conceded that the elements essential to establish a prima facie violation of Section 8(b)(4)(D) are shown. Therefore the issue is whether the statutory defense is available to the Electrotypers that Meredith was failing to conform to a contract or a certification of the Board in assigning the work to the Pressmen.
 
 
 20
 Both the Pressmen, representing the employees to whom the work has been assigned, and the Electrotypers, seeking assignment of the work to employees whom it represents, have been certified by the Board as the representative of appropriate units of employees, one or the other of which must reasonably encompass the employees doing the disputed work. Both unions also have contracts with the company which further define the units which they represent. Under these circumstances, the availability of the statutory defense, and therefore the finding that the Act has been violated, depends upon the determination of which of the established bargaining units properly includes those employees. Such a determination is essentially one of interpretation of the outstanding certifications to make an appropriate unit determination giving consideration to any relevant changes in conditions which might have occurred.
 
 
 21
 Obviously the Board's decision that the disputed work was properly assigned to the Pressmen as the appropriate certified bargaining unit, precluded sustaining the Electrotypers' defense that it was entitled to the work under its certification and contract and that Meredith failed to conform to the certification of the Board in giving it to the Pressmen. But in these proceedings the Board has carefully considered the claims made for the Electrotypers and has denied them.
 
 
 22
 Electrotypers stress in support of their position that the operation of the Pin System machines eliminates some of the manual operations previously performed by them; that prior to the Pin System, the Pressmen never physically handled the plates at the stage of production where Machine No. 2 marks them with little pilot holes; that such making constitutes a size determining function traditionally performed by them; and that the function of Machines Nos. 1 and 2 is a folio marking operation and an integral part of the process of manufacturing the plates and is work belonging to Electrotypers. They protest that the term preregistration has not been properly defined or used by the Board. They insist that the determination of the Board was arbitrary and capricious and rely on caces cited by the Board.
 
 
 23
 The 'issue as to what unit is appropriate for bargaining is one for which no absolute rule of law is laid down by statute, and none should be by decision. It involves of necessity a large measure of informed discretion, and the decision of the Board, if not final, is rarely to be disturbed.' Packard Motor Car. Co. v. N.L.R.B., 330 U.S. 485, 491, 67 S.Ct. 789, 793. See also: Pittsburgh Plate Glass Co. v. N.L.R.B., 8 Cir., 113 F.2d 698, affirmed 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251; Harris Langenberg Hat Co. N.L.R.B., 8 Cir., 216 F.2d 146; N.L.R.B. v. Weyerhaeuser Company, 7 Cir., 276 F.2d 865, certiorari denied, 364 U.S. 879, 81 S.Ct. 168, 5 L.Ed.2d 102.
 
 
 24
 Insisting that the factual findings on which it has based its determination are supported by substantial evidence upon the record considered as a whole, the Board's position is that Pin System Machines Nos. 1 and 2 are essentially refined preliminary registration devices. The location of the pilot holes placed on the plates by those machines determines the location of the scribe marks automatically placed on the plates by Machine No. 6 which in turn determine, as did the scribe marks formerly located by hand, the position of the plates on the press for optimum registration. By replacing the former method of individually scribing each plate from a template positioned upon it by reference to a dummy proof, with a method whereby all the plates of a series are marked in precisely the same place through successive optical positionings in correlation to the same fixed proof positioned from markings made by reference to the dummy proof, Meredith has increased the accuracy and consistency of the positioning of the scribe marks and thereby reduced the time required for registration on the presses.
 
 
 25
 The preregistration process of scribing the plates by hand, which was replaced by the preregistration process performed on Machines Nos. 1 and 2, had traditionally been performed by employees in the Inspection and Make-Ready Department represented by the Pressmen. The employees in that department were included within the unit certified by the Board to be represented by the Pressmen and were specifically covered in the contracts between Meredith and the Pressmen. Since the disputed machines were basically a new device or method to accomplish the same operation of preregistration which the Pressmen had always performed, the Board was fully warranted in determining that the employees operating the new machines were properly included with the unit represented by the Pressmen. Local 26, International Fur and Leather Workers Union, 90 N.L.R.B. 1379; Amalgamated Meat Cutters and Butcher Workmen, Local 556, 101 N.L.R.B. 181; Window Glass League of America, AFL-CIO, 123 N.L.R.B. 1183. The continuing responsibility of the Pressmen for the quality of registration of the color plates, which depends substantially upon the accuracy with which preregistration is done, and which was one of the reasons advanced by Meredith as a basis for the initial assignment of the machines to the Pressmen, is another important factor supporting the Board's determination.
 
 
 26
 Since the location of the pin holes is determinative of the location of the trimming cuts on the plate, the use of the pins to position and hold the plates during the trimming operations has eliminated many of the manual operations formerly performed by the Electrotypers. With the increased accuracy of the preregistration accomplished by the new machines, it is possible to have all plates cut to exactly the same size, thereby greatly reducing the number and variety of trimming cuts to be determined and made by the Electrotypers. Although the preregistration position marks (pilot holes) made by the Pressmen are now used to determine the location of the trimming cuts, the Electrotypers are still performing all the trimming operations done on the plates, the relevant extent of their certification and contract. The amount of trimming they do has been reduced through the process of elimination, and not by replacement or performance by another method.
 
 
 27
 Nor does the contention that the folio marking operating performed on Machine No. 1 determines where the plate is to be trimmed, a matter formerly determined by the Electrotypers through use of the gauges on the beveling machine, sustain the claim that the employees operating that machine are doing work traditionally done by the Electrotypers. The operation of referring to a plan of running to determine where to trim the plate-- to leave on it the amount of dead metal necessary to properly position it on the press-- has now also been eliminated entirely. The folio marking operation, which has rendered it unnecessary, locates the cuts to be made by relation of the printed matter on the plate to its position as it should appear on the printed page. It does not determine the amount of dead metal to be left on the plate as none is left on pin system plates. The location of the cuts is determined by reference to the dummy proof, the same reference formerly used by the pressmen in scribing the plates by hand. This claim to the work, therefore, is also based upon the elimination of processes not replaced, and cannot prevail over the Pressmen's claim to the work arising from their certification.
 
 
 28
 We are in accord with the reasoning followed and the determination of the jurisdictional dispute between the unions made by the Board in this case. As we declared in Harris Langenberg Hat Co. v. National Labor Relations Board, 8 Cir., 216 F.2d 146, 148, quoting from the Supreme Court in the case of Pittsburgh Plate Glass Co. v. N.L.R.B., 313 U.S. 146, 152, 61 S.Ct. 908, 85 L.Ed. 1251, affirming a decision of this Court, 8 Cir., 113 F.2d 698:
 
 
 29
 'The Labor Act places upon the Board the responsibility of determining the appropriate group of employees for the bargaining unit. In accordance with this delegation of authority, the Board may decide that all employees of a single employer form the most suitable unit for the selection of collective bargaining representative, or the Board may decide that the workers in any craft or plant or subdivision thereof are more appropriate.'
 
 
 30
 The Supreme Court, in the case of May Department Sotre Co. v. N.L.R.B., 326 U.S. 376, 380, 66 S.Ct. 203, 206, 90 L.Ed. 145, modifying and affirming a decision of this Court in 146 F.2d 66, said:
 
 
 31
 'The judicial review afforded is not for the purpose of weighing the evidence upon which the Board acted and perhaps to overrule the exercise of its discretion but to 'guarantee against arbitrary action by the Board."
 
 
 32
 The record discloses painstaking care and fairness on the part of the Board and seems to justify the confidence in the Board as expressed by the Supreme Court in N.L.R.B. v. Radio and Television Broadcast Engineers Union Local 1212, 1961, 364 U.S. 573, 583, 81 S.Ct. 330, 336, 5 L.Ed.2d 302, as follows:
 
 
 33
 'It (the Board) has had long experience in hearing and disposing of similar labor problems. With this experience and a knowledge of the standards generally used by arbitrators, unions, employers, joint boards and others in wrestling with this problem, we are confident that the Board need not disclaim the power given it for lack of standards. Experience and common sense will supply the grounds for the performance of this job which Congress has assigned the Board.'
 
 
 34
 We affirm the decision that the Electrotypers could not rightfully claim the work against the Pressmen on the grounds of having either a contract or a Board certification to it and their strike was a violation of Section 8(b)(4)(D) of the Act.
 
 
 35
 Decree is granted enforcing the Board's order.