DETROIT NEWSPAPER PUBLISHERS ASSOCIATION, the Evening News Association, Owner and Publisher of the Detroit News, Knight Newspapers, Inc., Owner and Publisher of the Detroit Free Press, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 16855, 16856.

United States Court of Appeals Sixth Circuit.

Feb. 17, 1967.

See also 382 U.S. 374, 86 S.Ct. 543, 15 L.Ed.2d 423.

Lawrence M. Kelly, Detroit, Mich., for petitioners, Daniel J. Tindall, Jr., Detroit, Mich., on brief, Dickinson, Wright, McKean & Cudlip, Detroit, Mich., of counsel.

Solomon I. Hirsh, Atty., N. L. R. B., Washington, D. C., for respondents, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Wayne S. Bishop, Atty., N. L. R. B., on brief.

Before WEICK, Chief Judge, PECK, Circuit Judge, and CECIL, Senior Circuit Judge.

WEICK, Chief Judge.

For more than twenty-five years the publishers of The Detroit News and The Detroit Free Press have engaged in joint bargaining on a multiemployer basis with the Paper Handlers and Pressmen's Unions which represented their employees. In the bargaining the publishers were represented by Detroit Newspaper Publishers Association, which they had organized.[1] Over the years many collective bargaining agreements were entered into as a result of bargaining conducted in this manner.

The sole question in these cases is whether the two labor unions had the right to withdraw unilaterally from the multi-employer bargaining unit.

The unions gave timely notice of their intention to withdraw and of their desire to bargain on a separate and individual basis with each publisher. The publishers insisted on bargaining jointly and refused to enter into individual bargaining.

A separate complaint was filed against each publisher, charging an unfair labor practice in violation of Section 8(a) (5) and (1) of the Act, by refusing to bargain with the unions in the appropriate single employer unit. 29 U.S.C. § 158 (a) (5) and (1).

The Trial Examiner in the Paper Handlers' case upheld the publishers in their contention that the unions did not have the right of unilateral withdrawal from the multiemployer unit. The Trial Examiner in the Pressmen's case reached the opposite conclusion. He found that the publishers had engaged in unfair labor practices in violation of the Act and recommended an order requiring them to bargain separately with the unions.

On review, the Board overruled the Trial Examiner in the Paper Handlers' case, affirmed the Trial Examiner in the Pressmen's case, and entered orders as recommended, member Brown dissenting. The proceedings in this Court are to review and set aside the Board's orders, and the Board has cross-petitioned for enforcement.

The Board's decision was grounded on the fact that multiemployer units are voluntary and consensual. In the past the Board has permitted employers to withdraw unconditionally from the units, if the withdrawal was timely and unequivocal. Retail Associates, Inc., 120 NLRB 388. We have agreed with Board decisions to this effect. Universal Insulation Corp. v. NLRB, 361 F.2d 406 (6th Cir. 1966); NLRB v. Sklar, 316 F.2d 145 (6th Cir. 1963).

The present case was one of the first in which the Board was called upon to decide the question of the right of the union to withdraw.

The Board was of the view that, in all fairness, unions should be accorded equal rights with employers to withdraw and that there was no reason to treat them differently. The Board was of the opinion that if employers and labor unions were locked in multiemployer units with no chance to withdraw, they would be discouraged from entering into such units which have proved so beneficial in bargaining, both to employers and employees, in many industries.

The publishers contended that when a union withdraws from a multiemployer unit, its strength *vis-a-vis* the employer is substantially enhanced, but when the employer withdraws his position is weakened. They argued that when the unions in this case withdrew, they would still continue to represent employee groups of competing single employers, and may engage in whipsaw strikes. If such a strike were called the publishers fear that the unstruck publisher might not have the right to resort to a lockout to combat it, which the Supreme Court had upheld as a means of preserving the multiemployer unit, in NLRB v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d

1. The Association has represented the Publishers in bargaining with a total of 14 unions, 9 of which are on a multiemployer basis and 5 are on an individual basis.

839 (1965), and in (Buffalo Linen) NLRB v. Truck Drivers Local Union, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957). It is this fear of loss of an economic weapon to combat the whipsaw strike that appears to be of concern to the publishers.

It was the position of the publishers that their right to group protection was recognized by Congress in enactment of the Taft-Hartley Law, and in particular Section 8(b) (1) (B) of the Act, which makes it an unfair labor practice for a labor organization to interfere with an employer in the selection of his representative for collective bargaining purposes.

The publishers contended that they have a right "to stay grouped so long as their employees stay grouped in a multi-employer union." In other words, the publishers maintain that when a union unilaterally withdraws from the multiemployer unit, this interferes with their choice of a representative and operates to fragmentize the unit. They argued that if the Board permits the union to exit from the unit similar conditions should be imposed on the union, which should provide for a separate union for each publisher. They contend that this is necessary in order to maintain equality.

The Board's answer is that Section 9(b) of the Act gives it broad discretion to determine the appropriate bargaining unit, Packard Motor Car Co. v. NLRB, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947), and it maintains that in determining the propriety of the unit it may not take into account the effect on the bargaining power of either party. It asserts that the Act does not constitute the Board as an "arbiter of the sort of economic weapons the parties can use in seeking to gain acceptance of their bargaining demands" and only Congress may establish national labor policy. NLRB v. Insurance Agents' Union, 361 U.S. 477, 497, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). See also NLRB v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); American Ship Building Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965).

In considering the legislative history of multiemployer bargaining, the Supreme Court in (Buffalo Linen) NLRB v. Truck Drivers Local Union, supra, said 353 U.S. at page 96, 77 S.Ct. at page 647:

"Rather, the compelling conclusion is that Congress intended 'that the Board should continue its established administrative practice of certifying multi-employer units, and intended to leave to the Board's specialized judgment the inevitable questions concerning multiemployer bargaining bound to arise in the future.' "

The Court in *Buffalo Linen* did not pass upon the right of the union to withdraw, but in a footnote reserved the matter for determination in an appropriate case.

In reviewing the action of the Board, we cannot say that there was no rational basis for its orders or that it acted unreasonably and abused its discretion in the establishment of the single bargaining units.

The Second Circuit Court of Appeals recently ruled on the identical question and upheld the Board in Publishers Ass'n of New York City v. NLRB, 364 F.2d 293 (2d Cir. 1966), cert. denied, 385 U.S. 971, 87 S.Ct. 509, 17 L.Ed.2d 435 (Dec. 5, 1966).

It would seem to us, however, that the Board could with propriety inquire into the good faith of withdrawals and whether they are harmful to either party, particularly where, as here, the unit has been in existence and has operated satisfactorily for so many years. In so doing, the Board would exercise the same authority which it has in imposing a condition that withdrawals must be timely and unequivocal. But this is an area which Congress has confided to the discretion and expertise of the Board, and in which the Courts may not interfere unless the Board violates the statute or abuses its discretion. We do not so find from the record in this case.

■ The Board rightly notes that an inequality of withdrawal rights might weaken the multiemployer units as instruments of collective bargaining by discouraging their formation. The soundness of this reasoning is inherent in recognition of the fact that our national labor policy, as embodied in the statute, is aimed at strengthening the institution of free collective bargaining without regard to the positions of the individual parties. To the extent that multiemployer units foster the process of bargaining in the public interest, they are a valuable concept. However, such an analysis of the situation reveals that equality of withdrawal rights is only half of the issue at stake. Besides insuring equal treatment of unions and employers, in our judgment Board policies should be framed substantively to bolster the multiemployer unit as an instrument of national policy.

Thus, while fear of being "locked in" a unit might discourage entrance by a union as the Board has argued, it must be equally clear that a virtually unfettered right of withdrawal, even if available to both sides in parity, might also destroy the attractiveness of such arrangements. The Board might well find that the instability resulting from such conditions had undermined the multiemployer unit as an effective tool of labor relations.

Higher standards for withdrawal from the unit would be consistent with the consensual nature of the multiemployer unit, since withdrawal for good cause could be granted equally to either party. Furthermore, underlying the entire statutory scheme which has been interpreted to authorize such arrangements, is the notion that they serve the important public interest in these matters, as well as the interest of the immediate parties.[2]

■ After the withdrawal in the present case, each publisher would of course still have the right to be represented in separate bargaining by the Association. This is guaranteed by Section 8 (b) (1) (B) of the Act and the unions may not interfere with the exercise of this right.

Relative to the fear of the publishers, we do not say that after withdrawal from the unit the unions could with impunity conduct a whipsaw strike against one of the publishers and that the other would be powerless to exercise its economic weapon of a lockout. The unstruck employer in such a situation would certainly not need the lockout to preserve the multiemployer unit, but it might need the economic weapon in order to prevent its business from being ruthlessly destroyed. This is particularly true in the newspaper industry where the commodity, news, is perishable, competition with other media is keen, and the employer is compelled to deal with a multitude of unions.

■ In our judgment, where the lockout is to support an employer's legitimate bargaining position, he could no more be deprived of its use than the right to strike could be taken away from the employees. This we believe is implicit in *Buffalo Linen, Brown* and *American Ship Building*. While *American Ship Building* actually involved an impasse in bargaining, the opinion of the Court, written by Mr. Justice Stewart, was not so limited. It pointed out other instances where the Board had approved lockouts. Id. at 307, 85 S.Ct. 955. It stated:

"Thus, we cannot see that the employer's use of a lockout solely in support of a legitimate bargaining position is in any way inconsistent with the right to bargain collectively or with

2. In Atlantic C.L.R.R. Co. v. Railroad Trainmen, 262 F.Supp. 177 (D.C.D.C. Jan. 16, 1967) the Court upheld the right of the railroads under the Railway Labor Act to insist on bargaining in a multiemployer unit. It distinguished Publishers Ass'n of New York City v. NLRB, supra, on the ground that railroads and other public utilities do not have the weapon of lockout for their protection, which the Court intimated was available to the publishers.

the right to strike." Id. p. 310, 85 S.Ct. p. 963.

See also Detroit Newspaper Publishers Ass'n v. NLRB, 346 F.2d 527, vacated and remanded 382 U.S. 374, 86 S.Ct. 543, 15 L.Ed.2d 423 (1966).

Petitions for review denied and enforcement granted.