**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**YOUNG METAL PRODUCTS COMPANY (formerly Young & Greenawalt Company) and International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, AFL–CIO, Local Lodge No. 1012, Respondents.**

**No. 16019.**

United States Court of Appeals
Seventh Circuit.

Oct. 2, 1967.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Atty., N. L. R. B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Leon M. Kestenbaum, Atty., N. L. R. B., Washington, D. C., for petitioner.

J. F. Souders, Alan I. Berger, McMahon & Berger, St. Louis, Mo., for respondents.

Before DUFFY, Senior Circuit Judge, and SWYGERT and FAIRCHILD, Circuit Judges.

DUFFY, Senior Circuit Judge.

The Labor Board petitions for the enforcement of its order issued against respondents on March 6, 1966.[1]

The Board found the respondent Company (Company) violated Section 8(a) (2) and (1) of the National Labor Relations Act by prematurely recognizing respondent Union (Boilermakers) as exclusive bargaining agent for its employees at Granite City, Illinois; that the Company violated Section 8(a) (2), (3), (1) and that the Boilermakers violated Section 8(b) (2) and (1) (A) by entering into and enforcing a contract containing a Union Security clause; by threatening employees with discharge if they did not comply with this provision, and by discharging employees Minner and Barnett for refusing to join the Boilermakers. The Board further found the Company violated Section 8(a) (1) of the Act by threatening and interrogating employee Williams.

In early July 1964, the Company was operating three plants in Michigan and Indiana which fabricated and produced

---

1. Reported at 157 N.L.R.B. No. 18.

corrugated metal culvert pipes.[2] The Company decided to open an additional plant at Granite City, Illinois, to manufacture a similar product.

The Company's president Young and vice-president Smith went to Granite City and purchased land and buildings needed for the new operation. When interviewed by a reporter for a local newspaper, Smith stated the Company's new operation would start within a few weeks, and that the Company planned to start with a work force of thirty men, and that this number might be increased to forty.

On July 17, 1964, while Young and Smith were seated at a bar in a local restaurant, they were approached by a man named Kincaid who indicated that he knew that a new plant was to be opened in Granite City. Smith stated the plant would open on July 23rd. Kincaid said he "might know some people who were looking for a job." Smith voiced his approval stating he did not know anybody in Granite City. Kincaid stated he would have some prospective employees at Smith's motel on the following Thursday morning.

At the appointed time and place, Kincaid showed up with four men. Smith told the men they would receive a wage of $2 per hour and they probably would be entitled to hospital benefits. There was no discussion as to other terms of employment.

Smith took the four employees to the building where the new plant was to be located, and put them to work at cleaning up the premises. He then returned to his motel room. While there, Kincaid called by telephone and identified himself as a representative of the Boilermakers Union. He told Smith that all four men had signed Boilermaker authorization cards and asked Smith to sit down with him and discuss a contract. Smith replied—"You arrange for a meeting and * * * we will see if you can prove it." Kincaid later called and stated that he had made arrangements for a luncheon with the Mayor of the city who would check the signatures on the cards.

The meeting was held. The Mayor checked the authorization cards and verified the signatures. Smith and Kincaid discussed the terms of a contract and reached an understanding.

Kincaid asked Smith to prepare a final copy of the contract. On July 25, the final draft was ready and Kincaid and Smith each signed. The contract included a Union Security clause which Smith had suggested, and a dues checkoff pursuant to which the Company deducted $6 a month from each employee for union dues.

It is undisputed that the Company commenced its operation at Granite City on July 23rd, and that during the first three weeks the Company's employment ranged from four to seven employees; from mid-August to November 1st, the employment ranged from thirteen to twenty-one employees, and that after November 1st the number of employees declined so that late in November and all of December, the employees numbered six to seven.

Clyde Boyd, a city alderman, was a representative of the United Steelworkers of America (Steelworkers). He learned the Company planned to operate in Granite City and he made several visits to the plant site to check on the Company's progress. He signed up some of the employees for the Steelworkers, and by September 15, when a representation petition was filed with the Board, at least ten of the Company's employees had signed Steelworkers authorization cards.

On September 15, the Boilermakers posted a notice on the plant bulletin board that its initiation fee would be $5.50 for those joining by October 1st, but would be $25 thereafter. Also, the Boilermakers Union steward began to press employees to join the Boilermakers.

On September 19, employee Minner was warned to pay his initiation fee or "You

---

2. At East Chicago, Indiana, the Company employed an average of 10 to 12 employees; at its Ladoga, Indiana plant, an average of 8 to 10 employees; and at its Shelby, Michigan plant, an average of 6 to 7 employees.

are not going to be working here." At the end of the month, Minner was discharged. Also, there is substantial evidence in the record that employee Barnett was discharged for not joining the Boilermakers.

In mid-September, the Company posted a notice on the bulletin board stating— "All employees of this Company who have been employed for (30) thirty days or longer and have not paid their union initiation and monthly dues will be discharged immediately."

The basis of the Board's findings that the Company unlawfully recognized the Boilermakers is that on the date of recognition, the Company did not employ a representative complement of employees.

It is clear from the record that on the date of union recognition, four men were employed. It also appears that one of these four quit the following day and a second employee left after two days of employment. Further, on the critical date, the plant was not in production. The machinery had not been installed. At that time no employee was engaged in regular production or maintenance work.

The Company urges that as of July 23, when it had four employees at work, it was presented with authorization cards from all four employees. It argues that under such circumstances it could not have a good faith doubt as to the Boilermakers' majority status, and that it had no choice but to recognize the Boilermakers Union. Indeed, the trial examiner concluded such recognition of the Boilermakers by the Company was not premature.

The Company also argues that the period from August 11 to November 1st relied on by the Board was not representative. It points out that a fire had occurred which stopped production. There also had been received a customer's request for an accelerated delivery date for a large shipment of culvert pipes destined for Africa.

The most important issue before us is whether the Company prematurely recog-nized the Boilermakers as the exclusive bargaining agent for its employees. We hold that the Labor Board properly found the Company violated Section 8(a) (2) and (1) of the Act by recognizing, on July 23, the Boilermakers as exclusive bargaining agent for its employees. We also hold that the Company and the Boilermakers violated Section 8(a) (2), (3) and (1) and Section 8(b) (2) and (1) (A) by entering into and enforcing a contract containing a Union Security provision in a contract that was not valid.

In the recent case of National Labor Relations Board v. Krieger-Ragsdale & Co., Inc., 379 F.2d 517 (7 Cir., 1967) this Court considered and discussed Section 9(b) of the Labor Management Relations Act which gives to the Board discretion to determine appropriate bargaining units. We pointed out that the Board's informed exercise of discretion is rarely to be disturbed. In Krieger-Ragsdale we said: " * * * Unit determinations are not findings of fact, but judgments upon the facts in accordance with varying guidelines of relevancy or rules of inference based upon experience and the purpose of the statute being administered. * * * "

In National Labor Relations Board v. Guy F. Atkinson Co., 9 Cir., 195 F.2d 141, 144, the Court said: "The rule thus expressed, suggesting that where a group of employees is rapidly expanding, so that the initial work force cannot truly represent more than a small fraction of the contemplated total, it will not be recognized as representative of an appropriate unit, is one frequently followed by the Board. * * * A collective bargaining agreement made under those circumstances has been held ineffective. Daniel Hamm Drayage Co., 84 N.L.R.B. 458, (1949), enforced N.L.R.B. v. Daniel Hamm Drayage Co., 5 Cir., 185 F.2d 1020."

The Court's function is to review the Board's exercise of discretion and decide whether the Board's unit determinations were reasonable as applied to the facts. The Board's decision was not unreasonable, arbitrary or capricious.

See National Labor Relations Board v. Weyerhaeuser Co., 276 F.2d 865 (7 Cir., 1960); Packard Motor Co. v. National Labor Relations Board, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947).

We conclude that substantial evidence on the whole record supports the Board's finding that the Company and the Boilermakers violated Section 8(a) (1) and (2) and 8(b) (1) (A) by threatening employees with discharge for noncompliance with the Union Security provision in the contract.

We hold also that substantial evidence on the whole record supports the Board's determination that the Company violated Section 8(a) (3) and (1) by discharging employees John Barnett and Lowell Miner, and that the Boilermakers violated Section 8(b) (2) and (1) (A) by causing the discharge of Minner. Also that the Company violated Section 8(a) (1) by threatening to discharge employee Fred Williams if he engaged in union activity and by interrogating him as to his pre-trial statements to a Board agent. Texas Industries, Inc. v. National Labor Relations Board, 336 F.2d 128, 132–134 (5 Cir., 1964).

The order of the Board will be

Enforced.