The **LONG ISLAND COLLEGE HOSPITAL,** Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent,

and

**Local 144, Hotel, Hospital, Nursing Home and Allied Services Union, SEIU, AFL–CIO,** Respondent-Intervenor.

**Nos. 99 and 100, Dockets 77–4083 and 77–4099.**

United States Court of Appeals, Second Circuit.

Argued Sept. 23, 1977.

Decided Nov. 17, 1977.

---

Martin D. Heyert, New York City (Kelley, Drye & Warren, and Roger J. Karlebach, New York City, of counsel), for petitioner.

Allison W. Brown, Jr., Deputy Asst. Gen. Counsel (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Madge F. Jefferson, Atty., N.L.R.B., Washington, D. C., of counsel), for respondent.

Everett E. Lewis, New York City (Vladeck, Elias, Vladeck & Lewis, New York City, of counsel), for respondent-intervenor.

Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill. (Richard L. Epstein, and K. Bruce Stickler, Chicago, Ill., of counsel), for The American Hospital Assn., amicus curiae.

Before FRIENDLY, SMITH and MULLIGAN, Circuit Judges.

FRIENDLY, Circuit Judge:

This case has a long history; therein lies much of its difficulty. Before us are a petition for review and a cross-petition to enforce an order of the National Labor Relations Board (the NLRB or the Board) finding that Long Island College Hospital (LICH), a non-profit hospital, had violated §§ 8(a)(5) and (1) of the National Labor Relations Act (NLRA), by refusing to bargain with Local 144, Hotel, Hospital, Nursing Home and Allied Services Union, SEIU, AFL–CIO (the Union). The New York State Labor Relations Board (SLRB), on December 28, 1964, certified the Union as the exclusive collective bargaining representative of

> All full time and regular part time employees in the maintenance of plant and engineering department (excluding chief engineers, assistant chief engineers, maintenance supervisor and clerk) . . .

See 34 SLRB 324, 336 (1971). The refusal to bargain is conceded. At issue is the propriety of the Board's recognizing the 13-year old certification by the SLRB, rather than making its own unit determination and conducting an election. In pursuing this course the Board expressly declined to follow the decision of a divided panel in *Memorial Hospital of Roxborough v. NLRB*, 545 F.2d 351 (3 Cir. 1976), which was rendered after the decision of the Administrative Law Judge (ALJ) in this case.

*The Prior Proceedings*

The case has its origin in a petition filed by the Union on July 1, 1963, with the SLRB, seeking certification as the exclusive collective bargaining representative for all of LICH's service and maintenance employ-

ees. New York had recently brought non-profit hospitals in cities having a population of a million or more within its labor relations law, 1963 N.Y. Laws ch. 515; at that time such hospitals were excluded from coverage by the NLRA. Another union, the Maintenance Division of the Building and Construction Trades Council (Maintenance Division) sought a unit limited to skilled employees in the maintenance of plant and engineering departments. LICH contended for a single overall unit, excluding only supervisory, professional and confidential employees.

Dealing with the dispute between the Maintenance Division and the Union, which then argued the opposite of the position with respect to the appropriate unit which it was to take later, the SLRB said, 27 SLRB 405, 411 (1964):

In a number of cases, where no claim of representation had been made for a separate unit of skilled engineering maintenance department employees, we have found a combined service and maintenance unit to be appropriate. But where a separate unit of skilled maintenance employees has been sought, we found weighty considerations both for, and opposed to, the establishment of such a separate unit. Thus, in *Wyckoff Heights Hospital,* 27 SLRB No. 18, we stated:

"On the one hand, they are a homogeneous group of skilled employees having relatively higher earnings and no interchange with the service employees, as well as a history of bargaining in, and Board decisions establishing, separate units of skilled building maintenance employees in non-hospital cases. On the other hand, there is our policy against overcompartmentalization of hospitals into numerous small bargaining units, and prior Board decisions (uncontested, to be sure) finding maintenance and service units appropriate in hospitals, as well as some history of bargaining in the hospital industry whereby the maintenance em-

ployees have been included in the same unit as the service employees. We find that these factors are equally balanced. Under these circumstances, especially the fact, that the engineer-maintenance employees perform types of services identified with traditional trades and crafts, we believe that the as yet unexpressed desires of these employees should be determinative. Accordingly, as we have done in similar situations, we shall ascertain, by a self-determination election, the desires of the engineer maintenance employees as to whether they prefer to bargain in a separate unit, or in a larger unit including the service employees."

Nothing in the present record warrants a different determination here.

The SLRB directed an election in which service employees were furnished a ballot asking whether or not they desired to be represented by Local 144 but maintenance of plant and engineering department employees were asked to vote on three questions:

1. Do you want a separate bargaining unit limited only to maintenance of plant and engineering department employees? (to be answered "Yes" or "No")

2. If there is a separate unit of maintenance of plant and engineering department employees, do you then desire to be represented for the purposes of collective bargaining by Maintenance Division, or by Local 144, or by neither?

3. If there is a combined unit of maintenance of plant and engineering department employees and service employees, do you then desire to be represented for the purposes of collective bargaining by Local 144? (to be answered "Yes" or "No")

27 SLRB at 415–16.[1]

Forty-seven out of 55 eligible maintenance employees voted. Twenty-one voted

---

1. The SLRB detailed that its further course would be as follows:

If a majority of the answers to Question "1" are affirmative, we shall find a separate

in favor of a separate maintenance unit, five voted against it, one ballot was challenged and 20 ballots were left blank. On the second question, 24 employees voted for the Union, four voted for the Maintenance Division, 16 voted "neither", two voters left the question blank and one was challenged. The service employees voted 151–309 against the Union. Over objections by LICH unnecessary here to detail, the SLRB on December 28, 1964, certified the Union as the representative of the maintenance and engineering employees.

When LICH refused to bargain, the Union, instead of filing an unfair labor practice charge under the New York Labor Relations Act, invoked a section of that statute providing for mediation, fact-finding and arbitration of disputes between non-profit hospitals and unions. LICH sought to enjoin this action as an improper remedy and finally prevailed, *Long Island College Hospital v. Catherwood,* 23 N.Y.2d 20, 294 N.Y.S.2d 697, 241 N.E.2d 892 (1968), *appeal dismissed,* 394 U.S. 716, 89 S.Ct. 1457, 22 L.Ed.2d 672 (1969). Some six months after the decision of the New York Court of Appeals the Union filed an unfair labor practice charge before the SLRB. A hearing was held in which LICH contested both the appropriate bargaining unit and the conduct of the election. The SLRB ruled against LICH and was ultimately sustained, *Long Island College Hospital v. New York SLRB,* 32 N.Y.2d 314, 345 N.Y.S.2d 449, 298 N.E.2d 614 (1973), *cert. denied,* 415 U.S. 957, 94 S.Ct. 1485, 39 L.Ed.2d 572 (1974).

LICH thereupon entered into negotiations with the Union, although persisting in its contention that the unit was inappropriate. In August 1975 it discontinued negotiations on that ground. Meanwhile, on August 25, 1974, the NLRA had been amended to include non-profit hospitals, Public Law 93–360, 88 Stat. 395. The Union then filed a refusal to bargain charge with the Regional Director of the NLRB, who issued a complaint. An ALJ conducted a hearing where extensive evidence was taken with regard to existing conditions relevant to the appropriateness of a bargaining unit limited to maintenance and engineering employees and excluding service employees.

Stating that "[t]he principal issue herein is the effect to be given" to the SLRB certification, the ALJ ruled that the certificate should be honored. He quoted the NLRB's statement in the *Memorial Hospital of Roxborough* case, *supra,* 220 NLRB at 403 (1975), that it "will recognize the results of an election conducted by a responsible state agency, and therefore extend comity to a certification issued pursuant to such an election, where the state agency's election procedures conform to due process requirements and effectuate the policies of the Act." After reviewing LICH's contentions, he found these conditions to have been satisfied, held that LICH had violated §§ 8(a)(5) and (1), and recommended a bargaining order and a broad cease and desist order. LICH having filed exceptions, a three member panel of the NLRB, declining to follow the Third Circuit's intervening ruling in the *Roxborough Hospital* case, *su-*

maintenance of plant and engineering department unit to be appropriate, and shall tally the votes of these employees on Question "2", disregarding Question "3". In that event, we shall also find a separate unit of service employees to be appropriate, and shall tally the votes of the service employees in that unit.

On the other hand, if a majority of these voters do not answer Question "1" affirmatively, we shall then find a combined unit of service employees and maintenance of plant and engineering department employees to be appropriate. In that event, we shall mingle the ballots of the maintenance of plant and engineering department employees with the ballots of the service employees, tallying the

votes of the plant and engineering department employees on Question "3", and the votes of the service employees. Only one overall total will be given, and we shall not separately report the results of the service and of the maintenance of plant and engineering department employees.

27 SLRB at 416. While the SLRB procedure obviously had the effect of denying the service employees any vote on whether *they* preferred one unit or two, this would also be true under the somewhat different procedures long followed by the NLRB in similar cases, see *Globe Machine and Stamping Co.,* 3 NLRB 294, 300 (1937); *Court Square Press, Inc.,* 151 NLRB 861, 865–66 (1965).

*pra,* 545 F.2d 351, adopted the ALJ's recommendations, 228 NLRB No. 13 (1977). LICH petitioned for review and the NLRB has cross-petitioned for enforcement.

### The Legislative History of the 1974 Amendment

Before proceeding further, it will be useful to set out relevant portions of the legislative history of the 1974 amendment bringing non-profit hospitals within the coverage of the NLRA. The amendment stemmed from a belief, that, as stated in the Senate Report, there was "no acceptable reason why 1,427,012 employees of . . . non-profit, non-public hospitals, representing 56% of all hospital employees, should continue to be excluded from the coverage and protections of the Act." Sen.Rep. No. 93–766, 93d Cong., 2d Sess. 3 (1974), 2 [1974] U.S. Code Cong. & Ad. News 3946, 3948, Legislative History of the Coverage of Non-profit Hospitals under the National Labor Relations Act, 1974 at 10 [hereinafter Legis. Hist.] The report continued in language that had also been contained in the House Report under the heading "Bargaining Units":

> Due consideration should be given by the Board to preventing proliferation of bargaining units in the health care industry. In this connection, the Committee notes with approval the recent Board decisions in *Four Seasons Nursing Center,* 208 NLRB No. 50, 85 LRRM 1093 (1974), and *Woodland Park Hospital,* 205 NLRB No. 144, 84 LRRM 1075 (1973), as well as the trend toward broader units enunciated. in *Extendicare of West Virginia,* 203 NLRB No. 170, 83 LRRM 1242 (1973).[1]
>
> [1] By our reference to *Extendicare,* we do not necessarily approve all of the holdings of that decision.

*Id.* at 5, U.S. Code Cong. & Ad. News at 3950, Legis.Hist., *supra,* at 12; H.R.Rep. 93–1051, 93d Cong., 2d Sess. 6–7 (1974), Legis.Hist., *supra,* at 274–75.

Senator Williams, chairman of the Senate Committee that had drafted the amendment elaborated upon this on the Senate floor:

> . . . The National Labor Relations Board has shown good judgment in establishing appropriate units for the purposes of collective bargaining, particularly in wrestling with units in newly covered industries. While the Board has, as a rule, tended to avoid an unnecessary proliferation of collective bargaining units, sometimes circumstances require that there be a number of bargaining units among nonsupervisory employees, particularly where there is such a history in the area or a notable disparity of interests between employees in different job classifications.
>
> While the committee clearly intends that the Board give due consideration to its admonition to avoid an undue proliferation of units in the health care industry, it did not within this framework intend to preclude the Board acting in the public interest from exercising its specialized experience and expert knowledge in determining appropriate bargaining units. (*NLRB v. Delaware-New Jersey Ferry Co.,* 128 F.2d 130 (3d Cir. 1942)).

120 Cong.Rec. S12104 (July 10, 1974); Legis.Hist., *supra,* at 363.[2] Senator Taft, who had introduced a bill, S2292, that would have limited the NLRB to designating only four appropriate units in health care institutions, to wit, units of professional employees, technical employees, clerical employees, and service and maintenance employees, stated in accepting the Committee's compromise:

> "I believe this is a sound approach and a constructive compromise, as the Board should be permitted some flexibility in unit determination cases. I cannot stress enough, however, the importance of great caution being exercised by the Board in reviewing unit cases in this area. Unwarranted unit fragmentation leading to

2. The "extension" section of the Congressional Record for July 22, subsequent to adoption of the Conference Report by the House, reports a similar statement as part of a "Speech of Honorable Frank Thompson in the House of Representatives, July 11, 1974." 120 Cong.Rec. E4899.

jurisdictional disputes and work stoppages must be prevented.

"The administrative problems from a practical operational viewpoint and labor relation viewpoint must be considered by the Board on this issue. Health-care institutions must not be permitted to go the route of other industries, particularly the construction trades, in this regard.

"In analyzing the issue of bargaining units, the Board should also consider the issue of the cost of medical care. Undue unit proliferation must not be permitted to create wage 'leapfrogging' and 'whipsawing'. The cost of medical care in this country has already skyrocketed, and costs must be maintained at a reasonable level to permit adequate health care for Americans from all economic sectors."

120 Cong.Rec. S6940–41 (May 2, 1974), Legis.Hist., *supra*, at 114.

A final relevant bit of legislative history is the rejection by both houses of Congress of amendments that would have preserved certain state labor laws from preemption by the new national law. 120 Cong.Rec. S6991 (May 2, 1973) (Senator Mondale); 120 Cong. Rec. H4597–99 (May 30, 1974), Legis.Hist., *supra*, at 315–22 (Representative Quie). Opponents of these amendments stressed the need for a national approach and the problems of having collective bargaining in different states governed by different laws. See 120 Cong.Rec. H4598 (May 30, 1974), Legis.Hist., *supra*, at 317 (Congressman Thompson); 120 Cong.Rec. S6942 (May 2, 1974), Legis.Hist., *supra*, at 117–18 (Senator Taft). When the Conference Report was being debated, Representative Quie of Minnesota, one of the House managers who had sponsored the non-preemption amendment which the House had defeated, engaged in the following discussion with Representative Thompson of New Jersey, also a manager on the part of the House:

"Mr. Quie. . . . [W]hat is the application of the legislation on hospitals and unions presently engaged in bargaining under State laws, or even where no law, State or Federal, had previously applied to them?

"Mr. Thompson of New Jersey. To attempt to answer your questions, it seems that those hospitals presently engaged in bargaining will have to meet the requirements of the National Labor Relations Act when this legislation becomes effective. For instance, had a hospital recognized a minority union, it is contemplated that the hospital could no longer continue recognition. *It would seem the better practice that if either party questioned the validity of the recognition or the appropriate unit, they should file a representation petition with the NLRB.*"

120 Cong.Rec. H6393 (July 11, 1974), Legis. Hist., *supra*, at 388 (emphasis added). It should be noted, however, that while Congress rejected a special cession of jurisdiction amendment applicable to non-profit hospitals, there was recognition that § 10(a) of the NLRB would continue to apply. As Representative Thompson stated in response to a further question from Representative Quie:

The NLRA in section 10(a) empowers the Board to cede to any State agency jurisdiction over cases in any industry unless the Board determines the state statute is inconsistent with the corresponding provision of the NLRA. . . . As a matter of fact, I would urge the Board . . to exercise its authority . . . to cede jurisdiction to the respective State agencies . . . over disputes involving non-profit hospital employees if it determines that a State law is substantially equivalent to the Federal law. . . .

*Id.* See also 120 Cong.Rec. S6943 (May 2, 1974), Legis.Hist., *supra*, at 117 (exchange between Senators Mondale and Taft).

## Discussion

Our discussion naturally begins with the Third Circuit's decision in *Memorial Hospital of Roxborough v. NLRB*, 545 F.2d 351. Judge Garth's opinion for the majority, consisting of Judge Aldisert and himself, starts off from the language of § 9(b) of the NLRA:

The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by [this Act], the unit appropriate for purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof.

He proceeds to summarize the law on judicial review of NLRB unit determination, to wit, that such a determination "involves of necessity a large measure of discretion and the decision of the Board, if not final, is rarely to be disturbed," *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947). However, "[w]hen the Board so exercises the discretion given to it by Congress, it must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress empowered it,'" *NLRB v. Metropolitan Life Ins. Co.*, 380 U.S. 438, 443, 85 S.Ct. 1061, 1064, 13 L.Ed.2d 951 (1965), *quoting Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), and it remains for the courts to insure that the exercise of the Board's discretion is not "so unreasonable and arbitrary as to exceed the Board's power," *Packard Motor Car Co. v. NLRB, supra*, 330 U.S. at 491, 67 S.Ct. at 793. *See Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 171–72, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971).

Judge Garth concluded that, in view of the language of § 9(b) and these and other Supreme Court decisions, the Board could not lawfully abdicate to a state agency the exercise of its discretion as to the appropriate unit. He distinguished the three Board cases which the NLRB had cited in support of its application of comity in its *Roxborough* decision and upon which the ALJ in the instant case relied, as having involved, not the recognition of a state board's determination of an appropriate unit but rather of state conducted elections where the parties did not dispute the appropriateness of the unit.[3] Section 9(a), Judge Garth pointed out, does not require a Board supervised election in order to determine majority status; it speaks rather of "[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes. . . ." As state-supervised elections provide one mechanism for such designation or selection, extending comity to a state-supervised *election* would not be inconsistent with the NLRA. In Judge Garth's view, however, the language of § 9(b) required a different result for the issue of unit appropriateness. After again quoting that section's language, he concluded, 545 F.2d at 360:

> Thus the statute requires the Board to exercise its discretion as to an appropriate unit in each and every case. This

**3.** The cases are *Bluefield Produce & Provision Co.*, 117 NLRB 1660 (1957); *West Indian Co.*, 129 NLRB 1203 (1961); *Screen Print Corp.*, 151 NLRB 1266 (1965). Our only caveat relates to *West Indian Co., supra*, 129 NLRB 1203, where the dissent stated that "in this case the appellant contends . . . that the unit was arbitrarily determined." 129 NLRB at 1204. However, there is no elaboration of what aspect of the determination was allegedly arbitrary. Moreover, there apparently was no unit appropriateness dispute in the original, state election and the majority opinion mentions no such dispute before the NLRB.

The distinction drawn by Judge Garth is equally applicable to another case cited by the Board in *Roxborough, Cornell University*, 185 NLRB 329, 334 (1970) where unit appropriateness was "virtually" stipulated to by the parties and also applies to the two cases relied upon in *Bluefield* itself, *Olin Mathieson Chemical Corp.*, 115 NLRB 1501 (1956) and *T-H Prod-*

*ucts Co.*, 113 NLRB 1246 (1955). Thus, the only NLRB decisions which do appear to involve the application of comity in disputed unit appropriateness cases occurred after the Board's opinion in *Roxborough*: *St. Joseph's Hospital*, 221 NLRB 1253 (1975) and *Mercy-Memorial Hospital Corp.*, 221 NLRB 1 (1975), enforcement pending, *NLRB v. Mercy-Memorial Hospital Corp.* (6 Cir.) (No. 76–2338). Finally, none of the court cases cited to us by the Board approved use of comity in a disputed unit appropriateness case. See *Western Meat Packing Co.*, 350 F.2d 804 (10 Cir. 1965); *Intalco Aluminum Corp. v. NLRB*, 417 F.2d 36, 40 (9 Cir. 1969); *NLRB v. St. Luke's Hospital Center*, 551 F.2d 476 (2 Cir. 1976) (affirming an NLRB decision *not* to recognize a state-certified unit on grounds of comity); *Getreu v. Bartenders & Hotel & Restaurant Employees Union*, 181 F.Supp. 738, 741 (N.D.Ind.1960); *Methodist Hospital Corp. v. New York SLRB*, 382 F.Supp. 459 (S.D.N.Y.1974).

responsibility can neither be delegated to nor discharged by a state agency where Congress has sought to create a national labor policy by vesting this discretion in a national board. *La Crosse Telephone Corp. v. Wisconsin Employment Relations Board,* 336 U.S. 18, 24–27, 69 S.Ct. 379, 93 L.Ed. 463 (1948). Here, however, the Board abdicated its required duty by accepting the PLRB determination without exercising its own mandated discretion. In so doing the Board "overstep[ped] the law." *Packard Motor Car Co. v. NLRB, supra,* 330 U.S. at 491, 67 S.Ct. 789. Further support for this conclusion was found in the legislative history of the 1974 amendments to which we have referred.

Chief Judge Seitz dissented. Conceding that the unit determination must be made by the NLRB, he did not think the statute "necessarily preclude(s) the Board from relying on other processes of law, as long as it can assert a sound policy for doing so." In *Roxborough,* "[b]efore according comity, it reviewed the PLRB [Pennsylvania Labor Relations Board] proceedings and satisfied itself that they were in accord with due process standards and the policies embodied in the NLRA." In his view, when "[f]aced with the need to implement a national policy in an area hitherto left to state regulation, the Board could reasonably conclude that according comity to those state labor board decisions which are congruent with federal policy would best serve the purposes of the NLRA," 545 F.2d at 362–63.

We are not here required to choose between these two able opinions. Even if it were to be assumed, for purposes of argument only, that we might take the dissent's view that the NLRB may sometimes apply "comity" to state unit determinations, great care must exercised to make sure that the state decision at issue was precisely "congruent with federal policy." 545 F.2d at 363. There was insufficient basis for so concluding here.

■ Neither the NLRB nor the Union suggests that the Board was required by principles of *res judicata* to respect the 1964 certification of the SLRB. Any such contention would fly in the face of the language of § 9(b). Rather the Board and the Union contend that the Board was authorized, as a matter of "comity," to treat the SLRB's 1964 determination of an appropriate unit and consequent certification of the Union as if these had been its own.

■ "Comity" is a notion of highly uncertain content. The Board refers us to the statement in *Mast, Foos & Co. v. Stover Mfg. Co.,* 177 U.S. 485, 488–89, 20 S.Ct. 708, 710, 44 L.Ed. 856 (1900), that

Comity is not a rule of law, but one of practice, convenience and expediency . . . (which) has a substantial value in securing uniformity of decision, and discouraging repeated litigation of the same question . . . its obligation is not imperative. . . . Comity persuades; but it does not command. It declares not how a case shall be decided but how it may with propriety be decided.

The statement, however, was made in a far different context, namely, the extent to which one federal court of appeals should feel itself bound by the decision of another with respect to the validity and scope of a patent. Both courts were governed by the same law and the statement was made in deprecating the appellant's claim that the second court of appeals had given insufficient weight to "comity". More enlightening for this case, although not dispositive, is this court's recent statement in *NLRB v. St. Luke's Hospital,* 551 F.2d 476 (2 Cir. 1976). There we upheld a finding that an employer had engaged in an unfair labor practice by enforcing the union security clause in a collective bargaining agreement with a union certified by the SLRB to represent a unit which could not have been approved by the NLRB because of the "professional" proviso in § 9(b)(1). Rejecting the employer's claim to comity, Chief Judge Kaufman said, *id.* at 482 (citations omitted):

Arrangements resulting from state agency proceedings should generally be respected if consistent with federal policies. "Comity" in this sense reflects the desirability of supporting settled relationships in the absence of compelling countervail-

ing reasons. It is clear, however, that the NLRB is not required to defer to state proceedings where federal policy would be undermined.

We would strengthen the last sentence to say "is not required or permitted." Moreover, at least with the background afforded by the legislative history of the 1974 amendments bringing non-profit hospitals within the NLRB's jurisdiction, a significant difference in state and federal policy, even though falling short of the clear conflict present in the *St. Luke's Hospital* case, should suffice to defeat application of the "comity" doctrine to a state unit determination. Cf. *NLRB v. Committee of Interns and Residents,* 566 F.2d 810, 815 (2 Cir. 1977). It is not enough that, as said by the ALJ, the state and federal statutes "are not inimical"—a view echoing the Board's earlier statement in *St. Joseph's Hospital,* 221 NLRB 1253 (1975):

> it is not a touchstone of comity that the procedures and policies of a state agency be identical to those of the Board. All that is required is that the state proceedings violate neither due process nor the specific mandates of the Act.

■ On their face § 705(2) of the New York Labor Relations Act and § 9(b) of the NLRA are significantly different. Section 705(2) provides:

> 2. The board shall decide in each case whether, in order to insure to employees the full benefit of their right to self-organization, to collective bargaining and otherwise to effectuate the policies of this article, the unit appropriate for the purposes of collective bargaining shall be the employer unit, multiple employer unit, craft unit, plant unit, or any other unit; *provided, however, that in any case where the majority of employees of a particular craft, or in the case of non-profitmaking hospital or residential care center where the majority of employees of a particular profession or craft, shall so decide the board shall designate such profession or craft as a unit appropriate for the purpose of collective bargaining.* (emphasis added).

The proviso, which gives the majority of a craft an absolute right to mandate the craft's designation as an appropriate unit is by no means the same as the second proviso to § 9(b), that the Board shall not

> (2) decide that any craft unit is inappropriate for such purposes on the ground that a different unit has been established by a prior Board determination, unless a majority of the employees in the proposed craft unit vote against separate representation . . . . .

On the facts of this case the majority of any craft at LICH could have compelled the SLRB to designate it as an appropriate unit; no such compulsion could have been exercised on the NLRB under the second proviso to § 9(b) if it had decided to act on its own after it had acquired jurisdiction. Moreover, such *compulsion* to establish craft units runs counter to the 1974 legislative history stressing the dangers of overcompartmentalization in the health care industry.

The Board and the Union contend that, despite the facial differences which they ignore or deprecate, these were of no moment in the instant case. No group of LICH's maintenance and engineering employees actually alleged craft status under the proviso in 705(2) of the New York Act. Moreover, to show an identity of policy, we are pointed to the statement of the SLRB, quoted above, enunciating a policy "against overcompartmentalization of hospitals into small bargaining units," *Long Island College Hospital, supra,* 27 SLRB 405, 411, quoting *Wyckoff Heights Hospital,* 27 SLRB 75, 82 (1964), and to the following extract from the opinion of the New York Court of Appeals, 32 N.Y.2d at 323, 345 N.Y.S.2d at 455, 298 N.E.2d at 618 (citations omitted):

> Without merit is the hospital's argument that the unit selected may improperly fragment the hospital into numerous small units. Not only does the statute not preclude "fragmentation" but it declares that, in establishing an appropriate unit, the guide is that the board "insure to employees the full benefit of their right to self-organization, to collective bargaining and otherwise * * * ef-

fectuate the policies of this article" (Labor Law, § 705, subd. 2). This is accomplished at times by establishing a small bargaining unit limited to those employees who constitute a homogeneous group and desire the benefits of collective bargaining. . . . Actually, the board's practice in allowing skilled maintenance employees in hospitals to form a separate bargaining unit if they wish to do so, far from constituting overcompartmentalization, has avoided more serious fragmentation into numerous smaller units since, under the mandatory craft unit provision of subdivision 2 of section 705, each skilled craft, such as plumbers, painters and carpenters, could have demanded and could have been included in a separate unit.

These statements do show that the SLRB gave weight to the policy "against overcompartmentalization". But they show also that the SLRB decided as it did in light of the fact—indeed "especially the fact"—that in its view "the engineer-maintenance employees perform types of services identified with the traditional trades and crafts," 27 SLRB at 411; see also *id.* at 410, whose desires, if expressed, could have forced the SLRB into still further compartmentalization. This is particularly the thrust of the last sentence of the extract from the opinion of the New York Court of Appeals. In contrast the NLRB, in making an initial unit determination for LICH, would not have had to be worried about demands of a majority of a craft for designation of the craft as a separate unit; it would have been able to make its own determination, free from any such concern.

Counsel for the Board argues that, despite the lack of any such compulsion as stems from the proviso to the New York statute, the NLRB could have reached the same result, both on the evidence before the SLRB and that before the ALJ, as the SBRB did here. But neither counsel nor the Board said it *would* have reached that result, for the excellent reason that no one really knows how the Board would decide any case in this area of the law. In the fifteen post-amendment non-profit hospital cases cited to us, the Board rejected mainte-

nance-only units (as opposed to larger maintenance and service units) eleven times (*Shriners Hospital,* 217 NLRB 806 (1975); *Metropolitan Hospital,* 223 NLRB 282 (1976); *Jewish Hospital Association of Cincinnati,* 223 NLRB 614 (1976); *Riverside Methodist Hospital,* 223 NLRB 1084 (1976); *Baptist Memorial Hospital,* 224 NLRB 199 (1976); *St. Joseph's Hospital,* 224 NLRB 270 (1976); *Greater Bakersfield Memorial Hospital,* 226 NLRB No. 143 (1976); *Sutter Community Hospitals of Sacramento, Inc.,* 227 NLRB No. 18 (1976); *Anaheim Memorial Hospital Association,* 227 NLRB No. 25 (1976); *Northeastern Hospital,* 230 NLRB No. 162 (1977); *Peter Bent Brigham Hospital,* 231 NLRB No. 132 (1977)), and approved them only four times (*Sinai Hospital of Detroit, Inc.,* 226 NLRB No. 61 (1976); *Eskaton American River Health Care Center,* 225 NLRB 755 (1976); *West Surburban Hospital,* 224 NLRB 1349 (1976); *St. Francis Hospital Medical Center,* 223 NLRB 1451 (1976)). See also *Hebrew Rehabilitation Center for the Aged,* 230 NLRB No. 35 (1977) (approving maintenance-only unit, rather than maintenance and service unit, in a "health care institution operating as a center for the care of aged people.") However, the picture is not so favorable to LICH as these raw figures would indicate.

With commendable candor, counsel for the NLRB explained to us that there had been a serious difference of opinion among Board members on the question of certifying hospital maintenance and engineering units without service employees. Agreement does exist on such generalities as that

Section 9(b) of the National Labor Relations Act gives the National Labor Relations Board the authority to define bargaining units and indicates that the Board's purpose in making unit determinations should be "to assure to employees the fullest freedom in exercising the rights guaranteed by [the National Labor Relations Act]."

*Barnert Memorial Hospital Center,* 217 NLRB 775, 776 (1975), and that

As we have recognized and continue to recognize, our consideration of the issues related to the composition of bargaining

units in the health care industry must necessarily take place against the background of avoidance of undue proliferation. However, Congress left the . . matter of the determination of appropriate units to the Board, and the desire for nonproliferation does not, in our judgment, necessarily preclude our granting maintenance units in the health care area. Congress was aware that the Board has sometimes found that a separate maintenance unit is appropriate if the maintenance employees possess a community of interest sufficiently separate and distinct . . . to warrant . . . a separate unit. Yet, it did nothing to preclude our granting such units. Congress in fact rejected Senator Taft's suggestion that maintenance employees should always be combined with service employees into a single unit.

*Jewish Hospital of Cincinnati, supra,* 223 NLRB at 616.[4] See *Riverside Methodist Hospital, supra,* 223 NLRB 1084; *Sinai Hospital of Detroit, supra,* 226 NLRB No. 61. There is agreement also that in determining the existence of a "sufficiently separate and distinct" community of interest, the Board will look to "such factors as mutuality of interest in. wages and hours, commonality of supervision, skills and functions, infrequency of contact with other employees, lack of interchange and functional integration, and area practice and pattern of bargaining." *Eskaton American River Health Care Center, supra,* 225 NLRB at 756. However, there have been wide differences of opinion as to what several of these phrases mean in the particular context created

by Congress' expressions against proliferation of units in the health care industry. Members Penello and Walther were of the view that in such cases a more rigid standard than that applied in other industries should govern the appropriateness of separate maintenance units in hospitals, one that

> can be met when the unit sought . . is composed of licensed craftsmen engaged in traditional craft work, which is performed in a separate and distinct location apart from other employees in the health care unit.

*St. Vincent's Hospital,* 223 NLRB 638, 639 (1976). In contrast, Members Fanning and Murphy appear to require little more than the separate community of interest showing found sufficient in other contexts. See, e. g., *Riverside Methodist Hospital,* 223 NLRB 1084, 1087 (1976). In addition to the differences over the content of these legal concepts the cited opinions demonstrate that Board members draw widely divergent factual conclusions in the same cases.

■ With its own opinions in such disarray, it was peculiarly inappropriate for the Board to avoid a decision here by deferring to the dated certification of a state agency when there was at least some risk that the difference in the state statute might have affected the state agency's ruling—even if we were to assume, contrary to the majority opinion in *Roxborough, supra,* 545 F.2d 351, that in some cases this might be permissible. As said in *La Crosse Telephone Corp. v. Wisconsin Employment Relations Board,* 336 U.S. 18, 26, 69 S.Ct. 379, 383, 93 L.Ed. 463 (1949):

---

4. We agree with this conclusion. Moreover, the preamendment NLRB health care cases cited favorably in the legislative history of the 1974 amendment do not call for a different result. Two of the three cases are not determinative of the skilled maintenance unit issue, as they involved NLRB rejection of even narrower units than those at issue here. See *Woodland Park Hospital,* 205 NLRB 888 (1973) (x-ray technicians); *Four Seasons Nursing Center,* 208 NLRB 403 (1974) (2-man unskilled maintenance unit). In the third case, *Extendicare of West Virginia, Inc.,* 203 NLRB 1232 (1973), the union sought three separate units—for licensed practical nurses (LPN's), technical employees, and service and maintenance employees. The

employer contended that the only appropriate unit was a single all-employee unit. The NLRB approved 1) a separate LPN unit, and 2) a service and maintenance unit including technicals but excluding office clericals. As the issue of a separate maintenance-only unit was not before the Board, *Extendicare* did not raise the same issue as the instant case. Moreover, while the legislative history clearly approved *Woodland Park* and *Four Seasons,* its reference to *Extendicare* was obscure at best: "We do not necessarily approve all of the holdings of that decision." Sen.Rep. No. 93–766, 93d Cong., 2d Sess. 5 (1974), Legis.Hist., *supra,* at 12; H.R.Rep. No. 93–1051, 93d Cong., 2d Sess. 6–7 (1974), Legis.Hist., *supra,* at 274–75.

A certification by a state board under a different or conflicting theory of representation may therefore be as readily disruptive of the practice under the federal act as if the orders of the two boards made a head-on collision.

We add as a makeweight that insofar as one of the justifications for "comity" is judicial or administrative economy, it served little purpose here, where the ALJ felt compelled to conduct a hearing on existing conditions at LICH substantially as extensive as would have been held on a new petition for certification under 29 C.F.R. §§ 102.63 and .64.[5]

■■■ There remains a question concerning the proper disposition of this proceeding. The *Roxborough* court remanded the case to the Board, 545 F.2d at 362. It recognized, as we do, that "the Board may, in the proper exercise of its discretion, reach the same result" as the state agency had done. It seemed to assume, however, that if the Board also made sufficient findings, either by scrutiny of the record before the state agency or by its own inquiry, that the hospital's objections to the conduct of the election were unfounded, the Board might, without more issue an order holding that the hospital had unfairly refused to bargain. The question is whether, if the Board should find the separate bargaining unit to be appropriate, a new election must be held or the Board may rely on the results of the election held in 1964 should it conclude that LICH's objections to that election are without merit.

If the facts here were similar to those in *Roxborough*, we might well follow the course taken in that case. There the election was held in the fall of 1973, the court's decision was rendered only some three years later, and there would be good reason to believe that a union that had obtained a majority three years earlier was still the representative "designated or selected by the majority of the employees in a unit appropriate for such purposes," § 9(a). Here the interval is 13 years and only 8 of the 55 employees who were in the unit in 1963 are still members of the present unit of 69. This is particularly significant as the *SLRB's* original certification was explicitly granted only "for the period of one year . . . from the completion of . . . judicial review. . . ." of that order, a period which has already passed. 34 SLRB 324, 337. We are well aware of the decisions that even after the expiration of the one year during which an NLRB certification is conclusive, the union retains a rebuttable presumption of majority status, e. g., *NLRB v. Frick Co.*, 423 F.2d 1327, 1330 (3 Cir. 1970); *Terrell Machine Co. v. NLRB*, 427 F.2d 1088, 1090 (4 Cir. 1970), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91; *N.L.R.B. v. Washington Manor, Inc.*, 519 F.2d 750, 751 (6 Cir. 1975). But here we have held that the NLRB was not justified in accepting the SLRB's certification as its own but must make its own determination of an appropriate unit on the basis of existing employment conditions. However long the majority presumption may run in the ordinary case of a Board-certified election, that presumption must be considered attenuated thirteen years after an election not run under Board auspices. It would seem wholly inconsistent with the mandate of

5. We do not think it profitable to engage in lengthy discussion of decisions, notably *Raley's Supermarkets*, 143 NLRB 256 (1963), where the Board has "deferred" to the awards of arbitrators in "accretion" cases. See *NLRB v. Horn & Hardart Co.*, 439 F.2d 674, 679 (2 Cir. 1971). The Board seems to have become rather disenchanted with *Raley's*. See e. g., *Woolwich, Inc.*, 185 NLRB 783 (1970); *Patterson-Sargent Division of Textron, Inc.*, 173 NLRB 1290 (1968); *Beacon Photo Service, Inc.*, 163 NLRB 706 (1967); *Combustion Engineering Inc.*, 195 NLRB 909 (1972); and particularly *Hershey Foods Corp.*, 208 NLRB 452, *enforced memorandum* (3 Cir. 1974) (not reported officially), where the Board affirmed the rulings of its ALJ, who had noted that the *Raley's* case "preceded the line of cases cited above in which the Board had declined to defer to arbitral awards where accretion is in issue. The later cases must thus be deemed to supersede *Raley's* . . . if regarded as inconsistent therewith." *Id.* at 457. Although the Supreme Court noted *Raley's* with apparent approval in *Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 270 n. 1, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964), it made it clear that the deference to arbitration in unit cases was not to be a blind one, 375 U.S. at 272, 84 S.Ct. 401; and ultimately the Board declined to defer to the arbitrator's findings in that very case. *Westinghouse Electric Corp.*, 162 NLRB 768 (1967).

§ 9(b) "to assure to employees the fullest freedom in exercising the rights guaranteed" by the NLRA for the Board to deprive them of an election because of the vote taken by a New York board in 1964. If the Union in fact enjoys the degree of support claimed at argument, it should have no hesitation in submitting to the polls.

The cross-petition to enforce is denied; the petition to review is granted to the extent of vacating the Board's order, directing it to make its own determination of an appropriate bargaining unit on the evidence adduced before the ALJ and such further evidence, if any, as it deems appropriate, and thereupon to hold a representation election.