**FAIR OAKS ANESTHESIA
ASSOCIATES, P.C.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**FAIR OAKS ANESTHESIA
ASSOCIATES, P.C.,**
Respondent.

Nos. 91–1250, 92–1032.

United States Court of Appeals,
Fourth Circuit.

Argued May 5, 1992.
Decided Sept. 17, 1992.

Steven William Ray, Kruchko & Fries, McLean, Va., argued (John G. Kruchko, on brief), for petitioner.

Robert James Englehart, N.L.R.B., Washington, D.C., argued (Jerry M. Hunter, Gen. Counsel, D. Randall Frye, Acting Deputy Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Collis Suzanne Stocking, Supervisory Atty., N.L.R.B., on brief), for respondent.

Before PHILLIPS, MURNAGHAN, and NIEMEYER, Circuit Judges.

## OPINION

MURNAGHAN, Circuit Judge:

The National Labor Relations Board ("Board") issued a decision and order on September 30, 1991, finding that the Fair Oaks Anesthesia Associates, P.C. ("Employer") violated Section 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) and (1),[1] as amended, by its refusal to bargain with the Fair Oaks C.R.N.A. Association ("Association"), which was certified by the Board as the exclusive representative of the Employer's certified registered nurse anesthetists ("CRNAs" or "nurse anesthetists"). The Employer was ordered to bargain with the Association.

The Employer has not denied that it refused to bargain with the Association. Instead, it has petitioned the court, pursuant to 29 U.S.C. § 160(f), for review of the Board's order on the grounds that the Board failed to consider the impact of its own health care industry bargaining unit rule, see 29 C.F.R. § 103.30, and thereby selected an inappropriate bargaining unit. The Employer has contended that the appropriate unit should be composed of all of the Employer's non-partnered professionals, that is, both the CRNAs and the non-partnered physician anesthesiologists. The Board has cross-petitioned for enforcement of its order.

### I.

The Employer is a professional corporation that has a contract to provide anesthesia services for surgical and obstetrical procedures at Fair Oaks Hospital ("Hospital"), an acute care facility in Fairfax, Virginia. The Employer only operates at the Hospital. The Employer is responsible for the administration of anesthesia during approximately 550 surgeries and obstetrical procedures per month at the Hospital. Five doctors of medicine, specializing in anesthesiology, are the five shareholders of the Employer. The employees include eight other physicians who are employed as non-partner anesthesiologists and ten CRNAs.

The Association filed a petition with the Board on August 2, 1990, seeking certification as the collective bargaining representative of all of the Employer's CRNAs. At a hearing before the Board Regional Director on August 23–24, 1990, the Employer contended that a unit consisting solely of CRNAs was inappropriate, on the ground that the eight non-partner physicians should be included as well.

The Employer argued before the regional director that the Board should apply the standard of *St. Francis Hospital,* 271 N.L.R.B. 948 (1984) (*St. Francis II*), remanded sub. nom. *Electrical Workers v. N.L.R.B.,* 814 F.2d 697 (D.C.Cir.1987), in which the Board adopted the "disparity of interests" test to determine appropriate bargaining units in the health care field, requiring the establishment of "sharper than usual differences (or 'disparities') between the wages, hours, and working conditions, etc., of the requested employees and those in an overall professional or non-professional unit ... to grant the unit," as a means of giving effect to a congressional directive to avoid undue unit proliferation in the health care industry. The Board in *St. Francis II* declined to establish a limitation on the number of units, but instead required case-by-case examination of the

---

1. 29 U.S.C. § 158(a)(5) and (1) provides that "[i]t shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section 157 of this title; ... [and] (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

facts. Under the *St. Francis II* standard, the non-partner anesthesiologists could only be excluded from the bargaining unit if there was a "disparity of interests" between the CRNAs and the non-partner anesthesiologists. The Employer contended that the facts in the instant case lead to the conclusion that there was no such "disparity of interests," because "sharper than usual" differences between the two categories of employees did not exist.

The Association contended, on the other hand, that the less stringent "community of interests" test[2] was the proper one, since the "disparity of interests" test need be applied only when there are numerous employee classifications, whereas here, the Employer has only two job classifications, CRNAs and physicians. Thus, the Association advanced the contention that there was a sufficient "community of interests" among the CRNAs to warrant a separate unit. It also, nonetheless, argued further that "sharper than usual" distinctions between nurse anesthetists and the physician anesthesiologists justified a separate CRNA bargaining unit even under the more stringent *St. Francis II* "disparity of interests" standard.

In a decision issued on November 16, 1990, the regional director agreed with the Association's position that the "disparity of interests" test adopted by the Board in *St. Francis II* was designed to prevent the splintering of the workforce in large health-care institutions, and was not applicable to the Employer here, who only employed two categories of employees. However, the director, in addition to applying the "community of interests" test, went on to find that, even assuming that the "disparity of interests" test was the proper one, "sharper than usual" differences existed between the CRNAs and the non-partner anesthesiologists:

> Not only does the evidence establish that CRNAs are a distinct classification sharing a strong community of interest among themselves, the record also shows

there are material and significant differences between the terms and conditions of employment applicable to CRNAs and physicians, reflected in different educational, training and licensing requirements; in different work schedules and varying responsibilities for patient clinical care; and in sharp distinctions in their compensation and other fringe benefits. Most significantly, the record also shows that non-partner anesthesiologists are hired as prospective partners in the Employer—after a two-year period during which their employment is defined by a written contract of employment—when their medical skills, compatibility with the other doctors, and suitability for partnership is judged by the anesthesiologists who are partners in the Employer. By contrast, CRNAs are categorically ineligible for partnership or any other ownership interest in the Employer's business and their employment with the Employer is not directed toward achieving partnership status.

He concluded, therefore, that a separate CRNA bargaining unit was appropriate, and ordered an election among the CRNAs to be held on December 14, 1990.

The Employer filed a request for review by the Board, on the ground that non-partner physicians should be included in the unit. That request for review was granted. The Board affirmed the Regional Director in a one-page memorandum decision issued on May 1, 1991. Ballots from an earlier election were counted, and the Association was certified by the regional director as the exclusive representative of the CRNAs.

The Employer then refused the Association's request to bargain, prompting the Association to file a charge of unfair labor practices. The General Counsel issued a complaint charging the Employer with refusing to bargain with a certified representative in violation of Section 8(a)(5) and (1) of the Act. The Employer admitted that it refused to bargain, but responded that the

---

**2.** *See St. Vincent Hospital and Health Center,* 285 N.L.R.B. 365, 368 (1987) (although both tests consider similar factors, the "disparity of interests" test requires greater differences than is required in the "community of interests" test).

unit was inappropriate and the certification was invalid. The General Counsel filed a motion for summary judgment. The Board issued an order transferring the proceeding to the Board, itself, and a Notice to Show Cause why the motion should not be granted. The defense asserted by the Employer was that the decision was in error because of a failure to address the Board's regulations on health care industry bargaining units, *see* 29 C.F.R. § 103.30, which were held in abeyance pending Supreme Court review at the time of the regional director's determination but were subsequently upheld in *American Hospital Association v. N.L.R.B.*, — U.S. —, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991), prior to the Board's affirmance in the instant case.

The Board issued a short decision and order on September 30, 1991, in which it upheld the certification of the Association as the exclusive collective bargaining representative of the CRNAs, without addressing the Employer's contentions. It concluded that the Employer's refusal to bargain with the Association was a violation of Sections 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5) and (1), and an unfair labor practice. An order was issued, requiring the Employer "to cease and desist, to bargain on request with the [Association], and, if an understanding is reached, to embody the understanding in a signed agreement."

## II.

■ On appeal, the Employer has presented two arguments in support of its contention that the Board should be reversed. The first relies on a claim that the Board should have remanded the instant case to the regional director for reconsideration after the Supreme Court in *American Hospital* upheld the regulations found at 29 C.F.R. § 103.30, primarily because the Board had remanded in *Park Manor Care Center, Inc.*, 305 N.L.R.B. No. 135 (1991). The second is that, even if the "sharper than usual" legal standard was the appropriate one to apply, that standard was incorrectly applied. The Employer has the difficult burden of demonstrating an abuse

of the broad discretion accorded to the Board.

Under the National Labor Relations Act, the "initiative in selecting an appropriate [bargaining] unit resides with the employees." *American Hosp. Ass'n v. N.L.R.B.*, — U.S. —, —, 111 S.Ct. 1539, 1542, 113 L.Ed.2d 675 (1991). The Act grants to the Board the authority to resolve disputes regarding which bargaining unit is appropriate for the purpose of collective bargaining. 29 U.S.C. § 159(b). Such decisions by the N.L.R.B. are accorded wide discretion when reviewed by the courts: "The issue as to what unit is appropriate for bargaining ... involves of necessity a large measure of informed discretion, and the decision of the [N.L.R.B.], if not final, is rarely to be disturbed." *Arcadian Shores, Inc. v. N.L.R.B.*, 580 F.2d 118, 119 (4th Cir.1978) (quoting *Packard Motor Car Co. v. N.L.R.B.*, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947)). *Accord, American Hosp.*, — U.S. at —, 111 S.Ct. at 1547.

## III.

■ We first take up the argument that the Board abused its discretion by failing to remand the instant case to the regional director for reconsideration while deciding to remand in *Park Manor Care Center, Inc.*, 305 N.L.R.B. No. 135 (1991). The Employer has urged us to reverse the Board's order on the ground that the failure to remand contradicts the result in *Park Manor* and, as a consequence, creates conflicting lines of precedent, amounting to an abuse of discretion. *See Roadway Express, Inc. v. N.L.R.B.*, 647 F.2d 415, 419 (4th Cir.1981). We do not find the Board's decision in *Park Manor* to be inconsistent with the Board's affirmance of the regional director's decision in the instant proceeding.

After a lengthy rulemaking process, the Board issued a rule in 1989 which, *inter alia*, established that in acute care hospitals, except in "extraordinary circumstances," a maximum of eight bargaining units would be appropriate: (1) all registered nurses; (2) all physicians; (3) all pro-

fessionals other than registered nurses and physicians; (4) all technical employees; (5) all skilled maintenance employees; (6) all business office clerical employees; (7) all guards; and (8) all non-professional employees other than those categories already specified. 29 C.F.R. § 103.30(a). The United States District Court for the Northern District of Illinois enjoined enforcement of the rule on the grounds that the rule violated a congressional admonition to avoid undue proliferation of units in the health care industry. The Court of Appeals for the Seventh Circuit reversed, and the Supreme Court affirmed that reversal, holding that the Board's rule defining eight employee units in acute care hospitals was not facially invalid.[3] *American Hosp.,* ── U.S. ──, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991).

In *Park Manor,* the Board remanded a case involving a nonacute care nursing home to the regional director for further proceedings, in light of the Supreme Court's decision in *American Hospital* to uphold the regulations codified at 29 C.F.R. § 103.30 regarding health care industry bargaining units. *Park Manor,* 305 N.L.R.B. No. 135. *Park Manor* involved a nursing home and a union that sought to represent a service and maintenance unit that would exclude technical employees. The sole technical employees to be excluded were four licensed practical nurses (LPNs). In excluding the technical employees from the service and maintenance unit, the regional director cited cases that had applied the "community of interests" test, and had held that technical employees enjoy a separate community of interests. 305 N.L.R.B. No. 135, slip op. at 2. The Board

remanded the case for the regional director to take account of

(1) what was learned about nursing homes, LPNs, and technicals generally in the rulemaking proceeding that led to the Board's Rule governing units in acute care hospitals, and (2) Board cases involving nursing home units issued prior to the rulemaking. As also explained, we believe that the development of a fuller factual record may be necessary to determining whether the LPNs in this case have a community of interests that warrants keeping them separate from a unit that includes the CNAs and CMAs.

*Id.* at 3. The Board further stated that the general principles for determining appropriate units in acute care hospitals, as announced in its rulemaking, are "equally applicable" to nonacute care facilities. *Id.* at 4.

The Employer's position on appeal is that the Board's decision in *Park Manor* indicates a requirement that both the empirical knowledge about the health care industry that was acquired through the rulemaking process and the principles that were developed be considered in the instant case. We disagree. *Park Manor* involved the nonacute care facility of a nursing home. Nursing homes had originally been included in the Board's rule regarding bargaining units in acute care facilities, and considerable information specifically regarding *nursing homes* was newly available and had not been considered by the regional director. *Id.* at 3. The Board in *Park Manor* clearly stated its goal of seeking to promote the development of a body of empirical data through case-by-case analysis that would enable it to consider whether there was a sufficient basis for issuance of a rule governing bargaining units in nurs-

---

**3.** The Supreme Court reviewed the basis for Congress' admonition to the Board to avoid undue proliferation of bargaining units in the health care industry. Hospitals were excluded from the application of federal labor law between 1947 and 1973, but the extension of the Act to hospitals in 1973 was controversial. The controversy centered on the concerns "that labor unrest in the health care industry might be especially harmful to the public ... [and] the fact that so many specialists are employed in the industry created the potential for a large number of bargaining units, in each of which

separate union representation might multiply management's burden in negotiation and might also increase the risk of strikes." *American Hosp.,* ── U.S. at ──, 111 S.Ct. at 1544. That controversy led to inclusion in both the House and the Senate Committee Reports of the statement that "[d]ue consideration should be given by the Board to preventing proliferation of bargaining units in the health care industry." *Id.* ── U.S. at ──, 111 S.Ct. at 1545, *quoting* S.Rep. No. 93–766, p. 5 (1974); H.R.Rep. No. 93–1051, pp. 6–7 (1974); U.S.Code Cong. & Admin.News 1974, pp. 3946, 3950.

ing homes. *Id.* at 4. In contrast, the instant proceeding involves an Employer which is itself neither a nursing home nor an acute care hospital. In addition, *Park Manor* involved two other problems not present in the instant proceeding. The Board in *Park Manor* found (1) that the regional director had failed adequately to consider the prior cases regarding nursing homes, and (2) that the factual record was insufficiently developed to support the regional director's conclusion that the technicals did not share a community of interests with those in the unit such that they should be excluded. Neither of those factors exists here. The regional director here examined the prior cases regarding acute care facilities, and concluded that the situation of a small-scale Employer providing a single type of acute care service within a larger hospital was different from the situation of a large-scale hospital. Also, the regional director very carefully set forth in great detail the factual evidence to support the conclusion that CRNAs alone are an appropriate unit.

█ The Employer also has contended that the result in the instant case will undermine the new acute care facility rule at 29 C.F.R. § 103.30(a), which requires all registered nurses to be included in one unit, on the ground that the acute care institution of Fair Oaks Hospital will be affected by the certification of a CRNA unit consisting solely of a *sub-specialty* of nurses. The Employer has argued that allowing a sub-contractor's employees to fragment into bargaining units that are more narrow than those established in the rule for acute care facilities would permit many more than the eight specified units to operate within a hospital. That fragmentation, according to the Employer, would result in an "unwarranted increase in bargaining units [that] correspondingly increases the risk of labor disruptions and their impact on patient care," which is inconsistent with the Board's express goal of avoiding a proliferation of units in acute care facilities.

That argument is no more persuasive than the last. Because a sub-contractor is a separate employer from the acute care facility in which it operates, the sub-contractor necessarily must expect to deal with its own bargaining units. The Employer, a sub-contractor solely providing anesthesia services, is distinguishable from the kind of acute care institution that is covered by 29 C.F.R. § 103.30(a). In addition, the Employer employs only two categories of employees, physicians and nurse anesthetists. Distinguishing registered nurses from doctors is not inconsistent with 29 C.F.R. § 103.30, regardless of the fact that the Employer only employs a sub-specialty of registered nurses.[4] Taking account of that factual consideration is consistent with the purpose of the designation of appropriate bargaining units: to facilitate the collective bargaining between the employees of a particular employer and that employer. In that light, it would border on the senseless to hold an employer with only two categories of employees to a rule developed for a large acute care institution like the Hospital. The situation of sub-contractors thus necessarily will result in additional bargaining units, apart from the maximum of eight, absent extraordinary circumstances, that the rule establishes for acute care institutions. Analysis of the appropriate bargaining unit here was limited to those categories of employees employed by the particular Employer, and not by consideration of the categories of employees working for the Hospital. The Board's affirmance evidenced its approval of that approach and we find no abuse of discretion.

## IV.

█ The Employer has alternatively argued that, even if the principles enunciated by the Board during the acute health care rulemaking process do not apply here, the Board erred in affirming the regional director's finding that "sharper than usual" differences exist between the CRNAs and the non-partner anesthesiologists. The argument is unpersuasive.

Use of the "sharper than usual" differences analysis in considering whether there is a "disparity of interests" between cate-

---

4. Indeed, the rule for acute care hospitals provides for separate bargaining units for all physi-cians and for all registered nurses. 29 C.F.R. 103.30(a)(1) and (2).

gories of employees arose in the Fourth Circuit after *N.L.R.B. v. Frederick Memorial Hospital*, 691 F.2d 191 (4th Cir.1982). In that case, we considered the Board's denial of a hospital's request for review of a regional director's certification of the hospital's registered nurses as a separate bargaining unit. The hospital argued that the unit should include all of its professional employees, including emergency room physicians, pharmacists, and physical therapists. We rejected the argument that a unit composed solely of registered nurses was *per se* invalid, but we remanded for further proceedings on the ground that the regional director's application of the traditional test of whether the members of the proposed unit shared a sufficient "community of interests" did not give sufficient consideration to Congress' admonition against undue proliferation of units in health care facilities. 691 F.2d at 194–95.

Here, the regional director did not find that the "disparity of interests" test was applicable to an Employer with only two categories of employees. However, the "disparity of interests" test was nonetheless applied and, even though it is more stringent in its prevention of undue proliferation of bargaining units, the director still found that the CRNAs could appropriately comprise a separate unit.

The regional director's application of the "disparity of interests" analysis was extensive and well-reasoned. Although there is considerable functional integration between the two categories of employees, which is a factor in determining that employees should be included in the same bargaining unit, that is not sufficient to overcome the "sharper than usual" differences between CRNAs and non-partner anesthesiologists. Such differences include wages, benefits, work-time scheduling, qualifications and training, supervision, and collective bargaining history. For example, anesthesiologists earn annual salaries between $95,000 to $120,000 (compared to $30.00 to

$33.00 per hour for CRNAs, which is substantially less), regardless of the actual hours worked, and expect eventually to become partners or to leave the practice, while the CRNAs' earnings are based on their actual hours and they are not eligible for partnership. On that basis alone, it was reasonable to conclude that the interests of the non-partner anesthesiologists would likely be aligned with those of the partner physicians, in opposition to the interests of the CRNAs. There was evidence to support that assumption: the CRNAs initiated meetings with the president of the Employer corporation in 1987–1989 regarding their wages and working conditions; non-partner anesthesiologists joined in on the side of the partner physicians in the discussions, expressing opposition to CRNA requests.

The Employer's attempt to demonstrate that the CRNAs should not comprise a separate bargaining unit is unpersuasive. First, the Employer draws on cases holding that a unit composed of a single category of employee is inappropriate in health care institutions, *see, e.g., St. Vincent Hosp.*, 285 NLRB at 369 (unit consisting solely of registered nurses deemed inappropriate); *New York Univ. Medical Center*, 217 NLRB 522, 526 (1975) (separate unit for psychiatrists inappropriate), but none of the cases involved employers with only two categories of employees. Second, the Employer has sought to emphasize the commonalities between CRNAs and non-partner anesthesiologists,[5] but the similarities are not as weighty as the distinctions.

The conclusion that CRNAs may comprise a separate bargaining unit was within the realm of discretionary decision-making accorded to the Board. Its order should be

ENFORCED.

---

**5.** The Employer has presented a rather strained finding of those factors that have been identified as significant in cases analyzing the appropriateness of bargaining units in health care institutions. For example, the Employer has emphasized the "functional integration" between the CRNAs and the anesthesiologists in

administering anesthesia. However, of the two, the anesthesiologist remains responsible. Also, the Employer has described the education and training of the CRNA and the physician as "similar," glossing over the distinction between a registered nurse and a licensed physician. The cases cited did not involve lumping physicians

and nurses into the same unit; instead, one involved grouping registered nurses with other professionals like pharmacists and medical technologists, *Keokuk Area Hosp.*, 278 N.L.R.B. 242 (1986), and another involved grouping faculty registered nurses with staff registered nurses, *Jersey Shore Medical Center*, 225 N.L.R.B. 1191 (1976).

The Employer has further glossed over the fact that CRNAs are paid based on their actual hours and physical anesthesiologists are salaried, by characterizing the physicians' salary as computed according to an hourly wage. That characterization does not obscure the fact that anesthesiologists hoping to become part of the partnership will have interests that inherently conflict with those of CRNAs who want to increase their hourly pay.