**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.

No. 95-2856

SUZY CURTAINS, INCORPORATED, and
LORRAINE HOME FASHIONS OF CHINA,
Respondents.

On Application for Enforcement of an Order
of the National Labor Relations Board.
(11-CA-13913, 11-CA-13980, 11-CA-14114, 11-CA-14219)

Argued: June 6, 1996

Decided: February 11, 1997

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

_____

Enforcement granted by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** William Melvin Haas, III, HAYNSWORTH, BALDWIN,
JOHNSON & HARPER, Macon, Georgia, for Suzy Curtains. Lisa
Richardson Shearin, NATIONAL LABOR RELATIONS BOARD,
Washington, D.C., for NLRB. **ON BRIEF:** William M. Clifton, III,
HAYNSWORTH, BALDWIN, JOHNSON, & HARPER, Macon,
Georgia, for Suzy Curtains. Frederick L. Feinstein, General Counsel,
Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy
Associate General Counsel, Frederick C. Havard, Supervisory Attor-

ney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for NLRB.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

The National Labor Relations Board ("Board") petitions for enforcement of its order that Lorraine Home Fashions of China ("Lorraine") recognize as its employees' representative and bargain with the Amalgamated Clothing and Textile Workers Union ("the union") for a period of six months, and remedy certain other unfair labor practices. Because the decision of the Board is in accordance with law and has substantial support in the record, we grant enforcement.

I.

Suzy Curtains, Inc. ("Suzy"), and Lorraine were two closely related companies. They shared common directors, management, and labor policy, and they were considered a "single employer" for labor law purposes. Suzy was a manufacturing business; it employed over 130 workers involved in the cutting and sewing of curtains. Lorraine was and is an international trader and warehouse. It imports ready-made curtains from China, which it resells to domestic customers. Lorraine has around 30 employees. Suzy and Lorraine held themselves out to the public as a single enterprise.

In the fall of 1989, following an election in which over 150 Suzy/Lorraine employees voted, the union was certified as the collective bargaining representative for a plant-wide unit. Bargaining commenced in October.

2

On February 16, 1990, four months into the bargaining, the Board's regional director filed a complaint against Suzy and Lorraine, alleging various unfair labor practices, e.g. threatening loss of wages if the employees selected the union, interrogating employees about their union activities, discharging an employee for union activity, and others of a similar ilk. These charges were settled in May. The company did not admit that it had committed the unfair labor practices, but it agreed to post a Notice to Employees promising to obey the law. This notice was posted from May 25 through July 24.

Problems persisted. In June, the company unilaterally reorganized the warehouse in a manner that shifted work from the bargaining unit to a non-union supervisory position, in violation of 29 U.S.C. § 158(a)(1) and (a)(5).

On June 28, the company informed the union that any agreement should be coterminous with the anniversary of the union's certification.[1] This notice was prompted by a decertification petition. Though the petition was signed by a minority of the employees (74 of 150), the company accepted the assurance of the anti-union sponsor of the petition that others wanted to sign but were afraid to. The number and identities of these supposed union opponents have never been revealed.

This "coterminous" proposal brought effective bargaining to a halt, and the pace of unfair labor practices picked up. Employees were selectively disciplined or not disciplined for similar conduct based on union sympathies. An employee was told that the subject of raises had to wait until October "because of the union." Reasonable union requests for information necessary for bargaining met resistance. More unilateral changes in policies were imposed. In July, the union brought numerous unfair labor practice charges against the company. On October 15, 1990, the company withdrew recognition of the union, based on a second decertification petition received on the anniversary date of certification (October 12, 1990). This latter petition

_____

[1] After an election, an incumbent union is entitled to a one-year irrebuttable presumption of majority status. Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 37 (1987). After a year, the presumption continues, but it is rebuttable. Id. at 38.

was signed by a majority of then-current employees (76 of 139), though it was subsequently found invalid by an administrative law judge (ALJ) and the Board.

While the charges were pending before the ALJ, Suzy was sold to an unrelated company, Charlotte Curtains, Inc. On October 4, 1991, the ALJ issued a decision. The ALJ found that Suzy/Lorraine had committed the unfair labor practice charges. The ALJ's recommended order included an obligation for the companies to bargain with the union for an additional year.

On December 16, 1992, the Board upheld the ALJ's order against Lorraine in all material respects, except that it reduced the term of additional bargaining to six months. The same day, Charlotte Curtains settled the charges it had inherited from Suzy. Within weeks, Charlotte had closed the former Suzy factory.

Lorraine resisted the Board's order, and the Board petitioned this court for enforcement. We remanded the case for consideration of two issues: (1) whether Lorraine should be covered by the Charlotte settlement, and (2) whether the certified bargaining unit continued to exist in the wake of the sale and closure of the Suzy portion of the business. NLRB v. Suzy Curtains, Inc., No. 93-1317 (4th Cir. Mar. 3, 1994). On remand, the Board answered the first question no and the second yes. It therefore adhered to its earlier order. Lorraine continued its resistance, and so the Board has again petitioned for enforcement.

II.

We must enforce the order of the Board if it is in accordance with law and has "substantial support in the record as a whole[.]" NLRB v. Nueva Engineering, Inc., 761 F.2d 961, 965 (4th Cir. 1985).

A.

Other than to the finding of a violation of 29 U.S.C. § 158(a)(5) arising from the "coterminous" proposal, Lorraine mounts no strenuous challenge to the Board's findings on the merits. Lorraine's pri-

4

mary position is that the passage of time and reorganization of its business have conspired to relieve it of its obligation to bargain with the union. According to Lorraine, the unit with which it must bargain no longer exists. The Board found otherwise.

A decision of the Board concerning the appropriateness of a bargaining unit is entitled to considerable deference, and it is disturbed only if it constitutes an abuse of the Board's wide discretion. Packard Motor Car Co. v. NLRB, 330 U.S. 485, 491 (1947); Fair Oaks Anesthesia Associates v. NLRB, 975 F.2d 1068, 1071 (4th Cir. 1992). The Board gave cogent reasons for continuing to recognize the certified unit at Lorraine:

> Although it is no longer engaged in manufacturing, the Respondent continues to perform shipping and receiving work at the same location from which it had previously operated. By the respondent's own description, Lorraine employs about the same number of unit employees now (26) as it did at the time of the election (approximately 30). Lorraine's employees currently perform the same type of work under the same conditions and supervision as they did when the manufacturing operation existed. The bargaining unit is still a wall-to-wall, plantwide unit, albeit composed exclusively of warehouse-type employees and therefore more homogenous than it had been at the time of the certification.

Though some may disagree with this reasoning, it surely does not fall outside the Board's "wide discretion."

B.

Lorraine argues that the Board should have followed Plymouth Shoe Co., 185 NLRB 732 (1970). Plymouth Shoe has some facial similarities, but is not so nearly on point as to be dispositive. Most importantly, in Plymouth Shoe, there was no incumbent union. An election had been held, but the result had been thrown out. Meanwhile, 96% of the bargaining unit employees had been terminated, and the nature and scale of the operation had been fundamentally changed. The Board declined to order a new election based on the originally certified unit.

5

Here, the diminution in unit membership is less-- about 80% -- and the remaining employees have seen no change in their work situation. Finally, the Board reasoned that there is a difference between setting up a unit in the first place for an election-- as in Plymouth Shoe -- and recognizing the continued vitality of a certified unit with an incumbent union. We agree with the Board.

C.

Next, Lorraine points out that, because of passage of time and employee turnover, only a few employees who voted in the union election remain. Moreover, the union has not been active at Lorraine during this lengthy litigation.

These concerns strike at a very real problem. Surely the best justice in the workplace is swift justice, which our administrative and judicial processes are often ill-equipped to dispense. A decision coming months or years after the fact may provide cold comfort to the winning litigant and may unnecessarily magnify the consequences for the loser (e.g. backpay awards).

Nevertheless, time is the price we must pay if we are to have due process of law. Thus, mere passage of time cannot ordinarily be given any weight in an unfair labor practice case, lest an employer's willingness to unlawfully refuse to bargain and to litigate over it be permitted to work to its advantage. As Justice Black wrote for a unanimous Supreme Court over fifty years ago:

> [T]he Board . . . requires that an employer bargain exclusively with the particular union which represented a majority of employees at the time of the wrongful refusal to bargain despite the union's subsequent failure to retain its majority. The Board might well think that, were it not to adopt this type of remedy, but instead order elections upon every claim that a shift in union membership had occurred during proceedings occasioned by the employer's wrongful refusal to bargain, recalcitrant employers might be able by continued opposition to union membership indefinitely to postpone performance of their statutory obligation. In the Board's view, procedural delays necessary fairly to deter-

6

> mine charges of unfair labor practices might in this way be
> made the occasion for further procedural delays in connec-
> tion with repeated requests for elections, thus providing
> employers a chance to profit from a stubborn refusal to
> abide by the law.

Franks Bros. Co. v. NLRB, 321 U.S. 702, 705 (1944). Accord, NLRB v. Katz, 369 U.S. 736, 748 n.16 (1962); National Posters, Inc. v. NLRB, 885 F.2d 175, 180 (4th Cir. 1989), cert. denied, 494 U.S. 1026 (1990).

Aside from being longstanding law, this rule has other justifica-tions. There is no reason to assume that Lorraine's"new" employees do not support the union. There are many union shops-- like those in mining, transportation, and heavy industry -- where no one, or practically no one, who originally voted for the union remains. Pro-union sentiment has endured, however. Moreover, the lack of union activity at Lorraine is not surprising in light of Lorraine's refusals to recognize and bargain. What else is the union to do? It is not mori-bund; it stands ready to bargain. Indeed, it made a bargaining demand immediately after the Board's decision on remand.

III.

Because the Board's finding that the certified unit continues to exist must be sustained, we turn briefly to the merits of the key unfair labor practice found by the Board -- the June 28, 1990, "cotermi-nous" proposal. Such a proposal is, in essence, a challenge to the union's majority status, to be effective as soon as the presumption of such status becomes rebuttable.

Lorraine argues that a decertification petition signed by 74 of 150 employees is a "sufficient objective basis" for a "good-faith doubt" of the union's majority status. See NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 778 (1990) (stating test for when an employer may legally refuse to bargain with an incumbent union). The Board responds that 76 is more than 74, and that there was no objective basis for Lorraine to posit that there were more employees against the union than those who signed.

The Board's decision is manifestly based on substantial evidence -- 76 is more than 74. We therefore affirm it. **2**

IV.

Finally, Lorraine argues that, even if it violated the Act, the imposition of a bargaining order was inappropriate. We disagree. A company that has been found to have unlawfully failed to bargain should be ordered to bargain. See Franks Bros., 321 U.S. at 705; NLRB v. Williams Enterprises, 50 F.3d 1280, 1289 (4th Cir. 1995).

For the foregoing reasons, we grant enforcement of the order of the Board.

ENFORCEMENT GRANTED

_____

**2** We cannot address whether the unfair labor practice charge based on the June 28 "coterminous" proposal would be sustainable under the ALJ's alternative rationale (prior and contemporaneous unfair labor practices made the decertification petition unreliable). Because the Board relied solely on the lack of a numerically objective basis to question the union's majority status, we are limited to its reasons under the doctrine of SEC v. Chenery Corp., 318 U.S. 80 (1943).